## UNITED STATES v. INTERNATIONAL FUR WORKERS UNION OF UNITED STATES AND CANADA et al.

### No. 14.

Circuit Court of Appeals, Second Circuit.

Dec. 19, 1938.

Markewich & Null, of New York City (Robert H. Elder, Samuel Markewich, and Arthur K. Garfinkel, all of New York City, and Joseph G. M. Browne, of Brooklyn, N. Y., of counsel), for appellants.

Thurman W. Arnold, Asst. Atty. Gen., John Harlan Amen, Sp. Asst. to Atty. Gen., and Moses M. Lewis and William L. McGovern, both of New York City, for the United States.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

The appellants were convicted on four counts of an indictment under the Sherman Anti-Trust Act, charging respectively (1) conspiracy to restrain interstate commerce in fancy fur skins, (2) conspiracy to monopolize such commerce, (3) attempting to monopolize such commerce, and (4) monopolizing such commerce. Sentence was suspended as to the appellant International Fur Workers Union of United States and Canada. The appellants Fur Dressers Union, Local No. 2, and Fur Floor Workers Union, Local No. 3, were fined $1,500 each under court 1, and sentence was suspended under counts 2, 3 and 4. The appellants Lucchi, Reiss and Hertzberg, for whom the jury recommended clemency, were sentenced to ten months in jail under each of the four counts, the sentences to run concurrently. Lucchi was president of the International Union, Reiss and Hertzberg were delegates of Local No. 2, and Silberstein, whose appeal has abated by his death, was business agent of Local No. 3. The three labor unions were unincorporated associations whose members were workers in the shops of employers known as "dressers."

The industry relating to fancy fur skins may be briefly described as follows: Raw skins are purchased by "collectors", from hunters and trappers in various states of the Union and in foreign countries; the collectors sell the raw skins to "dealers" located in and about New York City and cause them to be shipped to the dealers through the channels of interstate and foreign commerce. The dealer causes the raw skins so shipped to him to be taken sometimes directly from the railroad or ship terminal and sometimes after receipt at the dealer's premises, to the shop of a "dresser" who dresses or tans them. This process takes from three to ten days. About ninety per cent. of the dressers are located in New York and ten per cent. in New Jersey. After dressing, the skins are returned in trucks to the dealer who then sends them to a dyer. After being dyed, they are sold to manufacturers, unless the dealer is himself a manufacturer, and are made into the finished furs which are sold. Some of the manufacturers are located in states other than New York.

The indictment under which the appellants were convicted originally named more than ninety defendants as parties to the conspiracy to restrain interstate commerce in fancy fur skins. Some fifty of the defendants pleaded guilty before trial; a severance was granted as to twenty-nine; and the case went to trial against eleven, nine of whom were convicted and two acquitted. The theory of the Government's case, as stated by counsel, may be summarized as follows: Three corporations, which for brevity will be referred to as Factor Corporation, Associated Corporation and Allied Corporation, comprised within their memberships a large majority of the persons, firms and corporations engaged in the business of dressing fancy fur skins within

the states of New York and New Jersey. Factor Corporation and Allied Corporation were formed pursuant to a conspiracy having as its purpose the enabling of their members to control and dominate the entire industry of dressing fancy fur skins within the metropolitan area of New York; Associated Corporation, which had been organized several years before, became a mere appendage to Factor Corporation after the latter was formed. The purposes and effects of the conspiracy were (a) to eliminate competition among the dressers; (b) to fix uniform, excessive and non-competitive prices to be charged by dressers who were members of the three above-named corporations; (c) to pool all orders for dressing received by said members and allot them on a specified "quota" basis; (d) to coerce non-member dressers to become members and to prevent non-members from doing business; and (e) to employ exclusively members of the appellant unions in shops of dressers and to increase the wages of such union workers. It is contended that the appellants cooperated with Factor Corporation, Associated Corporation and Allied Corporation in carrying the conspiracy into effect.

On their part, all the appellants contend that the evidence was insufficient to connect them with the conspiracy or with acts committed in furtherance of it. They assert that their activities were not directed to furthering the unlawful ends of the dressers but to furthering the lawful ends of the unions, namely, the betterment of the economic conditions of their members. They further contend that the dressing of skins is not commerce, so that the proven restraint and monopolizing of such business were not within the prohibitions of the Sherman Anti-Trust Act; and that reversible error was committed in the admission of evidence and in the court's charge and refusal of requested charges. The labor union appellants also advance special contentions based on the ground that they are unincorporated associations.

During the year 1931 there was in force a collective bargaining agreement between the dressers, represented by Associated Corporation, and their employees represented by the appellant unions. In the autumn of that year, the unions were pressing for an increase of wages; not formally for an increase, but for what amounted to one, because the employers had not been living up to the agreed schedule and the unions were insisting that it be restored. When the two sides met in conference, the employers' representatives said that business was so bad they could not afford to meet the workers' demands; to which the union representatives replied "We want our price and you get your price; you can get your price by joining an association." At the conferences the unions were represented by the individual appellants; the employers by Shuter, Mendelson and Stern, who testified for the Government. The employers' committee agreed that an association should be formed; Morris Hillquit, an attorney, was consulted, and under his direction Factor Corporation was organized in December 1931. There was testimony that the individual appellants were present in his office when the committee representing the employers conferred with him. After the employers had agreed to form Factor Corporation, the agreement dated November 24, 1931, but actually executed later, was signed between Associated Corporation and the unions, restoring the former schedule of wages and providing for the exclusive employment of union workers. After Factor Corporation was organized practically all the dressers who were members of Associated Corporation became members of Factor Corporation, and by intimidation and violence many non-member dressers were coerced into joining.

The appellants contend that although their pressure may have caused the employers to make an unlawful agreement to restrain trade in dressing skins, they did not become parties to the agreement; that they were merely acting to further their own interests in a way they were privileged to do. It is doubtless true that if an employer refuses to pay a living wage and it results in some of his men committing theft, he will not be a party to their larcenies, even though he knows that they are going to steal; but he is not at liberty to urge them to supplement their wages by theft. Similarly, workmen may refuse to work except for such wages as they demand, but they may not agree with the employer that he shall commit crime to supply the wages. Mendelson testified that someone of the union representatives said that they "wanted" the employers to form an association and fix higher prices so that they could pay the increased wages demanded by the union, and that what was meant was "to belong to Factor." He testified that Lucchi said, "Well, join the association, you will get the

price." Under the evidence in the record, viewing it in the light most favorable to the Government, as we must after verdict, we think it was a jury question whether the appellants merely came to terms with the employers with knowledge that the latter intended to find the money by unlawfully suppressing competition or whether they urged and agreed that it should be found in this way.

Moreover, there is evidence that the appellants participated in acts in furtherance of the conspiracy by urging recalcitrant dressers to join the Factor Corporation. Thus, Reiss and Silberstein informed Meseritz that they would not supply him with labor unless he joined "the new association," in spite of the fact that he was willing to pay the union scale of wages and sign a labor contract. In consequence he decided that he would have to join, and did so; thereupon his employees returned to work. There are several instances in which one or more of the individual appellants asked a dresser to join the association and other instances in which they advised joining, stated that otherwise the dresser would have to contract with the unions and deposit $5,000 as security for performance of his contract. The appellants contend that reference to "the association" in these conversations referred to Associated Corporation and not to Factor Corporation; and that the appellants were privileged to urge dressers to join the Associated because it had a contract with the unions, long antedating the alleged conspiracy, by the terms of which Associated guaranteed in the amount of $5,000 performance of the wage contracts of each of its members, and stipulated that the unions should demand a like security from non-member employers to whom they supplied union labor. Granting that the unions were privileged to advise employers to join the Associated Corporation and to insist upon the depositing of security by those who were not members, there was no privilege to advise them to join Factor Corporation whose purpose was known to be suppression of competition in the dressing industry. Under the testimony we think it was a jury question whether the advice given by the appellants referred to Associated or to Factor.

Since there was evidence of the appellants' complicity in the conspiracy to suppress competition in the dressing industry, we must determine whether such conspiracy is forbidden by the Anti-Trust Act. The conspiracy was certainly in restraint of trade, its immediate purpose being to monopolize the dressers' business, divide it among members of Factor Corporation, raise the prices of the services performed, and suppress competition. The dressers' business consisted in getting raw skins from "dealers," some of whom were also manufacturers, cleaning them, and sending them back to the dealers from whom they were received. About ten per cent. of the dressers in the New York area were located in New Jersey, and took skins from New York dealers and redelivered them in New York. The record shows that at least four of these New Jersey dressers, Goodman, Ryan, Saletan and Hadegoff, were victims of the conspiracy. There was also National Fur Dressing & Dyeing Co., located in Chicago, Illinois, which did business in New York, sending skins for dressing in Chicago and return thereafter to their New York owners. Hence part of the trade restrained included transporting raw skins and returning dressed skins across state lines; this was clearly interstate commerce. The shipping of the raw skins from the state of New York into the states of New Jersey and Illinois is alleged in paragraph I of the indictment, and the reshipment in paragraph II.

The Government has argued the issue of interstate commerce upon much broader grounds, contending that the dressing is done while the skins are "in a direct and continuous flow of interstate trade," which is apparently supposed to start with the initial shipment to the dealer and to continue until the manufactured fur garment is received by the consumer. Were it necessary to adopt this theory in full, or even to hold that interstate commerce continued while the skins were being dressed, serious questions would be presented. We are referred to no evidence that the suppression of competition among dressers affected the number of skins shipped into New York, nor was it intended to lessen the supply of such furs. Neither do we know what percentage of raw skins after manufacture into finished garments is usually shipped out of the state, nor that the conspiracy to suppress competition among dressers decreased the usual percentage. In short, it does not appear that either the purpose or effect of the conspiracy was to lessen the quantity of raw skins brought into the state or the quantity of manufactured furs shipped out of it; its only effect was upon the persons

who dealt with the raw skins after they got here. Hence, with respect to the large percentage of skins which are shipped to dealers in New York and are dressed, dyed and manufactured here, the issue of interstate commerce presents grave difficulties. But we need not decide this question since there can be no doubt that the conspiracy did restrain interstate commerce with respect to such skins as were transported across state lines for dressing and return.

 It is true the distinction we have taken was not made in the charge of the court. The charge on this subject was very general. Interstate commerce was correctly defined as commercial intercourse that goes across state lines; and the jury was then told that they must be satisfied that "the fancy fur dressing industry, as its activities were revealed to you here, was a matter of interstate commerce, that is, that these skins for their treatment went back and forth across the lines of the states of the United States, from New Jersey, Pennsylvania, and from Maine and various other portions of the country." What constitutes interstate commerce is a question of law, once the facts are established. Since it was proved without contradiction that the persons controlling Factor Corporation aimed to prevent New Jersey dressers from doing business with New York dealers except upon terms of price-fixing and "quota" allotments approved by Factor, the court should have charged that a conspiracy existed to restrain interstate commerce in skins which were to be transported across state lines for dressing and return, and that the jury need decide only whether the defendants were parties to such conspiracy. But the appellants requested no such charge and cannot complain that it was not given. The court did not distinguish between skins which were shipped across state lines for dressing and return, and those which were shipped from outside, say Maine, and were dressed in the same state in which they were received by the dealer-consignee. But no such distinction was requested. Since the evidence was sufficient for conviction and the charge was correct in telling the jury that they must find that the skins went back and forth across state lines for treatment, we cannot reverse on the ground that the charge was not amplified in a respect not requested. The request at fol. 7556 does not reach this point.

 It is urged that if the conspiracy exerted only so limited a restraint on interstate commerce as we have indicated, the monopoly counts cannot stand. We are disposed to think they can (see 15 U.S.C.A. § 2), but we need not decide because since the sentences ran concurrently, it would avail the appellants nothing to reverse on the other counts if conviction on the first count be affirmed.

The appellants have seen fit to make 335 assignments of error. To discuss each one in this opinion would, of course, be impossible. It must suffice to say that we have considered all which have been urged in the voluminous briefs, but shall discuss only a few of them. No reversible error is found in the charge as given, or in refusals to charge as requested, with respect to presumption of innocence, burden of proof, circumstantial evidence, absence of motive, conspiracy, weight of evidence, good character testimony, or the testimony of Foxworth and Trapani, special agents for the federal bureau of investigation.

 There were presented numerous requests to charge with respect to the privileges of labor unions in dealing with employers of labor. The court declined these as framed and stated to the jury: " * .* * There is no doubt that a labor union has the right to say that it wants to have this condition or the other, and the labor union at times, as a condition to putting men in your plant may say you will have to deposit money; that is easily conceivable; but the question here is whether or not this was part and parcel of the plan, of the offenses charged in the indictment, not that they may do a particular thing in and of itself which may be perfectly lawful. The question is whether or not that thing alone, with other things, contributed and were part and parcel of an unlawful plan." We think this was sufficient; a defendant cannot insist that a charge shall be couched in the precise words he suggests to the court. Complaint is made that the court's reference to "an unlawful plan" left the jury without guidance as to what plan the court had in mind; but it must have been obvious to the jury that he was referring to the conspiracy as charged in the indictment and as proved upon the trial.

 There was introduced a large amount of evidence respecting threats of violence and actual batteries and bombings directed against dressers who were not, or refused to become, members of Factor Corporation, and in many instances there was no identification of the persons making the threats

or committing the violence. It is urged that such evidence was in no way connected with the appellants and that error was committed in denying their motion to strike it out. The indictment alleged that it was part of the conspiracy that the conspirators should employ various acts of violence to carry it out, and the proof was clear that Factor Corporation set on foot a reign of terror against recalcitrant dressers. The evidence objected to was competent to prove the character of the conspiracy. While there was no credible evidence that the unions or their representatives contributed to the acts of violence, there was other evidence upon which the jury could, and did, find that they were parties to the conspiracy. Consequently, the evidence competent to prove the character of the conspiracy was competent against them.

Finally, we come to the contentions peculiar to the unions. That unincorporated associations may be made parties defendant in civil proceedings brought under the Sherman Anti-Trust Act was established in United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762. No reason is apparent why they may not be prosecuted in criminal proceedings under that statute. In Brown v. United States, 276 U.S. 134, 48 S.Ct. 288, 72 L.Ed. 500, Mr. Justice Sutherland said at page 142, 48 S.Ct. at page 289: "The provisions of the act creating criminal and civil liability against such an association necessarily carry the implication that it may be proceeded against by its common name to enforce the liability. Consequently, for a violation of the Anti-Trust Act, it may be prosecuted, indicted, convicted, and judgment rendered against it and satisfied by execution out of its assets."

But an officer of an unincorporated association, no more than an officer of a corporation, is not authorized merely by virtue of his office to make his principal a party to an unlawful conspiracy. See Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963; Hill v. Eagle Glass & Mfg. Co., 4 Cir., 219 F. 719, modified on other grounds in Eagle Glass & Mfg. Co. v. Rowe, 245 U.S. 275, 38 S.Ct. 80, 62 L.Ed. 286. All that the court said on this subject was that if the individual defendants did the things charged against the unions "upon behalf of the unions," they might be found guilty along with the individuals. To this the appellant unions excepted. It was erroneous; it excluded the issue whether the unions had authorized or ratified what their officers did upon their behalf. For this reason the conviction of each of the labor union appellants must be reversed.

As to the individual appellants, however, we have found no error requiring reversal, and the judgment as to them is affirmed.