**UNITED STATES v. LOCAL 807 OF IN-
TERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFEURS, STABLE-
MEN AND HELPERS OF AMERICA
et al.**

No. 170.

Circuit Court of Appeals, Second Circuit.

April 4, 1941.

AUGUSTUS N. HAND, Circuit Judge,
dissenting in part.

Edward C. Maguire and Louis B. Boudin,
both of New York City, for appellants
Local 807, etc., and Cahill.

James D. C. Murray, of New York City (Louis B. Boudin, and Daniel Kirchman, all of New York City, of counsel), for other appellants.

John T. Cahill, U. S. Atty., of New York City (Edward J. Ennis, David L. Marks, and John L. Burling, Asst. U. S. Attys., all of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

These appeals are from convictions under two separate indictments (consolidated for trial); the first, for a conspiracy to violate the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note; the second, for a conspiracy to violate the "Anti-Racketeering Act, 18 U.S.C.A. § 420a et seq." The evidence was such that the jury might have found the following facts. The individuals accused were truck drivers in the City of New York, and members of the defendant union, Local 807 of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America. Campbell and Furey were delegates of this union; the others held no office. Large quantities of merchandise enter the City of New York from other states in motor trucks owned and operated by individuals and corporations engaged in the trucking business, who employ their own truck drivers to bring the trucks into the City—generally to warehouses on the west side—and to unload them. The accused objected to this and insisted that they should either drive and unload, or should at least unload, all trucks entering the City from outside the territorial jurisdiction of the union. For this service they demanded $9.42 for each large truck, and $8.41 for each small one, these being union wages for a full day's work. The operators resisted these demands, but the accused forced their claims upon them in some instances by actual violence to their drivers and trucks; in some by threats of such violence; in others by persuading receiving clerks not to receive the loads. At times the operators refused to allow the accused to have any part in the handling of their loads; more often they let them do some of the unloading; but in almost all cases they were forced to pay the full day's wage. After this had gone on for some time, a number of the operators were forced to sign agreements with the union, by which its members were to take over their trucks

as soon as they entered the City, to drive them to their destination, and there to unload them. All the accused were bona fide truck drivers and, with possible exceptions to be noted later, would have accepted the job of driving and unloading the trucks, had the operators consented. Their conduct was concerted; and it was for the most part either directed or countenanced by the delegates, Campbell and Furey, who did not themselves ride or unload the trucks.

The judge charged the jury that if they believed the accused to have committed these acts, it was a violation of both the Sherman Act and the "Anti-Racketeering" Act. As to the second indictment, although he told them that they must find that the money demanded and received was not "the payment of wages by a bona fide employer to a bona fide employee," and that the accused were not guilty "if the money which they * * * obtained * * * through the use of force and violence or threats * * * was paid as wages, and if the defendants who received the money were bona fide employees and the truck operators who paid the money were bona fide employers," he nevertheless added that the sums paid could not be regarded as wages if they "were not wages so paid in return for services performed * * * but were payments made * * * to induce the defendants to refrain from interfering unlawfully with the operation of their trucks." Later he said: "If * * * what the operator was paying for was not labor performed but merely for protection from interference by the defendants with the operation of the operator's trucks, the fact that a defendant may have done some work on an operator's truck is not conclusive." Moreover he refused requests which in substance would have told the jury that the extortion of money by threats of violence was not within the act, although no services were rendered, unless it was the object of the conspiracy to extort the money without rendering any service; that is, that if the accused stood ready to do the work, it was not a crime to take the pay.

 The convictions under the Sherman Act cannot stand after the decision of the Supreme Court in Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044. We have very recently considered the application of the doctrines there laid down in United States v. Gold, 2 Cir., 115 F.2d 236, and what we there said will serve here as well; for

there was no evidence of any concerted agreement to fix the price of trucking or of the commodities carried; nor was there any evidence that the action of the accused had in fact affected those prices. The first count of the "Anti-Racketeering" indictment was drawn under subdivision (a) of § 420a of Title 18 U.S.C.A.; it alleged that the accused had conspired to obtain money by violence and threats of violence directed against the drivers and trucks of the operators. The theory of the prosecution was that the unaccepted proffer of services by the accused, even though they made them in good faith, did not convert the payments into "the payment of wages by a bona-fide employer to a bona-fide employee,"—the exception in subdivision (a). The second count was for a conspiracy under subdivision (b) of § 420a and added nothing of substance to the first, unless we are to construe the subdivision as eliminating the exception which we have just quoted. The whole statute is very loosely drawn and we are not sure what subdivision (b) does add to subdivision (a), beyond making it an offence to extort "property * * * under color of official right." "Property" in subdivision (b) presumably includes "money" in subdivision (a) and, the phrase, "consent, induced by wrongful use of force or fear" in subdivision (b) must include a "threat to use force," in subdivision (a); if so the two subdivisions to some extent appear to overlap. However that may be, we cannot suppose that the exaction of wages by a "bona-fide employee" is forbidden by subdivision (b) after being expressly excepted from subdivision (a). We can attach no meaning to the third and fourth counts.

▮ The case therefore turns upon the meaning of subdivision (a); and that is plain enough save for the exception. We believe that the exception covers labor disputes, and indeed was primarily directed to them; for to exclude them would make it very nearly brutum fulmen. Theoretically it might indeed apply only to situations in which an employee procured by threats the payment of wages due under a contract which the employer had made without coercion; but there are two objections to so circumscribing it; first, the language is general and suggests no such distinction, and second, such occasions would be extremely rare. As to the first, if any employer is coerced into making a contract, the coercion ordinarily persists until the wages fall due, so that

it is proper to speak of them as being "obtained" by the original threats, or violence; and if the coercion does not persist, and the employer has become complaisant, there should be no crime anyway. As to the second objection, it would be an extremely rare occasion when coercion would be applied merely to collecting the wage upon a contract freely made. Practically always the crux of a labor dispute is who shall get the job and what the terms shall be; and such pressure—lawful or unlawful—as is put upon the employer is at the time the contract is made. After that it is seldom necessary to renew the pressure; its effect usually continues, as we have just said. To confine the exception to cases where the original contract was voluntary would therefore leave out the great mass of instances in which the issue would ever arise. The adjective "bona fide," qualifying both employer and employee, was not in our judgment added to cut out coerced contracts. Although the promisor may avoid such a contract, it is a contract until he does; and even after he has, he must restore any benefit he has received from the promisee's performance. Restatement of Contracts, §§ 480, 499. Congress can hardly have had any such niceties in mind as the difference between the agreed wage and the benefit to an employer of the services rendered in case he avoided a contract for duress. The words had quite another meaning in our opinion; they were designed to limit the exception to cases in which the employee really did the work for which he was paid, however he might secure the job; and to exclude cases where he disguised the levy of blackmail by a pretext of service never in fact rendered. For the foregoing reasons we do not believe that the act made it a crime for a labor union to get jobs or an increase in wages for its members, even by threats or violence. We do not indeed mean that such methods should be condoned, but the purpose for which they are used may indeed determine their criminality.

▮ The judge seems to have agreed with this interpretation, for he limited the guilt of the accused to those instances in which they collected payments, either without doing any work at all, or without doing all of the work paid for. His notion was that payments made for services which the operators refused could not properly be called "wages," to the payment of which alone the exception gives

immunity. That is also the prosecution's position, as we understand it. The question is whether the act applies in case the employee is ready and able to do the work and demands the job, but the employer, although coerced into paying the wage, prefers to employ a substitute to do the work. Perhaps we should not call such payments "wages," though that is not entirely clear. For example, an impresario or a theatrical producer, finding that the singer or actor whom he has engaged has ceased to draw audiences, may engage a more popular performer; it is at least debatable whether the payments that he must continue to make do not remain "salary," or "wages." However, that is a verbal question which we need not answer, because, even if it would too far distort the word to speak of such payments as "wages," it is incredible that, when Congress gave immunity to employees who succeeded in coercing their employer into giving them the job, it should have made it criminal to take the pay when he refused to let them work. The wrong is the extortion of money without quid pro quo, and a bona fide tender is the only step that the putative employee can ever take towards performance. Guilt is personal to the wrong-doer; it would be absurd to make it depend upon the fact that the employee had not gratuitously persisted in pressing his unwelcome services upon the employer. That would excuse the more heinous offence, and penalize the more venial. Hence we hold that, if the employee in good faith actually proffers his services, it is the same whether or not they are accepted. In the case at bar the accused were for the most part willing to do the work; indeed the fact that, especially after some of the operators finally yielded and signed contracts, members of the union served as drivers shows that at least the primary motive was to get the jobs. The position of the accused, when the operators refused to employ them, was like that of "stand-by" orchestras, so-called. If a conductor brings an orchestra from outside into the territory of a union powerful enough to coerce him, he must either employ local musicians in their place, or pay an amount equal to their aggregate wages if they had played. In such cases it may be doubtful whether the local players can in fact substitute for the outsiders, and that might condemn them; but there was no such doubt here, for the accused were competent drivers. On the other hand, as to some of them there was a question whether they

were in fact willing to serve; there was testimony indicating not only that at least they did not expect employment—which perhaps was not unnatural after two or three refusals—but more than that, that they would not have accepted it, and did not when it was offered. We shall assume arguendo that, had the issue been properly presented to the jury, there was evidence to sustain a verdict against these men.

That assumption will not change the result because the issue was not properly presented. It will be seen from the language which we have quoted from the charge that, although the judge several times told the jury that payments of wages were immune however procured, he added that "wages" did not include sums which were not paid for "services performed * * * but * * * in order to induce the defendants to refrain from interfering * * * with the operation of their" (the operators') "trucks." In that event they were not to "be regarded as wages." It was consistent with this language that, although the operators paid the daily wage to protect their trucks from violence, the accused would have driven and unloaded them if they had been allowed to do so. The jury were in substance told that the only payments which were immune were wages paid for work actually done. That this was the judge's understanding is confirmed by his refusal to charge several of the requests, especially the 58th, the critical part of which was as follows: "the proof must show not only that individual defendants obtained money without rendering adequate service, but that it was the aim and object of the conspiracy that all of the conspirators should obtain money without rendering adequate service therefor." A verdict should not stand when the jury has been so far misdirected upon the very kernel of the case; it is not only possible, but likely, that here they supposed many—perhaps all—of the accused were ready, as they certainly were able, to drive and unload the trucks. If they attended at all to what the judge told them, they must have thought this immaterial, and there was really nothing left for them to decide if they concluded that the payments had been extorted by threats.

█ In conclusion we may add that a consideration of the evil at which Congress was aiming, seems to us to confirm the construction we are putting upon what it said. For a number of years before 1934—at least

in the City of New York—the levy of blackmail upon industry, especially upon relatively small shops, had become very serious, and the local authorities either would not, or could not, check it. The courts were powerless, because the witnesses were terrorized and could not be protected if they told what they knew; the public felt themselves at the mercy of organized gangs of bandits and became much wrought up over the situation. It was, at least primarily, to check such Camorras that Congress passed this measure. Some of these offenders had been members of labor unions, real or pretended, and at times it may be that they covered their practices by the pretence that the tribute collected was pay for services rendered. We have already said that in our judgment it was to meet such excuses that the words "bona fide" were introduced. Congress might indeed have gone further than it did; it might have included payments extorted by threats for services rendered or offered; that too is a grave evil. But, grave as it is, it is of a different kind from that at which this act was aimed. The history of labor disputes is studded with violence which unhappily is not yet obsolete; but, although the means employed may be the same as those here condemned, the end is always different, for it is to secure work on better terms. That purpose may indeed lead far afield, even to the domination of a whole industry, but the stake is always the same; and it is toto coelo a different thing to seek to secure work or higher wages, from extorting money without proposing to give anything in return. Nor is that difference obliterated even though it was unreasonable to exact a full day's wage for services which would have taken much less than a day to perform. It is not unreasonable to ascribe to Congress the purpose of observing this distinction and of leaving to the states the maintenance of order in cases of disorders in labor disputes. True, it may be asked why Congress should not also have left to the states the suppression of such disorders as the act indubitably does forbid. That we cannot answer, and indeed it would not

be proper for us to import the distinction which we have, if the language used did not demand it. We have tried to show how it was the inevitable consequence of what was said; and it fortifies our conclusion that there was a possible purpose for the distinction. Furthermore, the proviso to § 420d, although that too is most obscure, at least shows a vague intention to discriminate between violence in labor disputes and elsewhere.

Judgments reversed.

CLARK, Circuit Judge (concurring).

I agree with the opinion and the judgment of reversal; but I think two further points should be noticed against the event of further proceedings or a new trial below. First, I do not see how a conviction can be had against the unincorporated Local 807 under the Anti-Racketeering Act; in other words, "person" in the act does not include such an amorphous group as this association of around 10,000 persons. It is hornbook law that, absent a clear legislative intent, an unincorporated association does not commit crimes, 7 C.J.S., Associations, § 17, p. 43; and Congress has often shown that it knows how to include an association as a person when it so desires, as in the Sherman and Clayton Acts, 15 U.S.C.A. §§ 7, 12, and literally a host of others,[1] but not in the general construction law, 1 U.S.C.A. § 1. Even with the express provision of the Sherman Act, convictions of unincorporated bodies for its violation are rare, and seem to rest so far only on dicta of the Supreme Court. Brown v. United States, 276 U.S. 134, 48 S.Ct. 288, 72 L.Ed. 500; and compare United States v. International Fur Workers Union, 2 Cir., 100 F.2d 541, 547, certiorari denied 306 U.S. 653, 59 S.Ct. 642, 83 L.Ed. 1051; Moffat Tunnel League v. United States, 289 U.S. 113, 118, 53 S.Ct. 543, 77 L.Ed. 1069. Hence the omission here is significant and is rendered more so by the language of § 6, 18 U.S.C.A. § 420d, implying personal, rather than vicarious, participation in the offense interdicted, and carefully excepting, not labor

---

[1] 2 U.S.C.A. § 241(f); 7 ibid. §§ 2, 72, 92(k), 116(f) (1), 123, 151, 182, 499a(1), 504, 589(1), 1561(a) (2); 15 ibid. §§ 12, 71, 142, 364, 431(e); 18 ibid. § 403; 19 ibid. §§ 172, 1341(c), 1401(d); 21 ibid. §§ 171(d), 321(e); 26 ibid. Int.Rev.Code, § 3228(a); 28 ibid. § 390a; 29 ibid. §§ 53, 113(c), 203(a); 38 ibid. § 592(e); 43 ibid. § 1171; 46 ibid. §§ 316(b), 801; 47 ibid. § 30; 48 ibid. §§ 471a(1), 663(4); 49 ibid. § 401(27); 50 ibid. § 82(a), with which compare 7 U.S.C.A. §§ 62, 242, and 26 ibid. Int.Rev.Code, §§ 145(c), 894(b) (2) (D), 3797(a) (1).

organizations themselves, but the impairing or diminishing of labor organization rights.[2]

Second, if, as the opinion suggests, convictions of certain of the defendants under an adequate charge can be sustained under § 420a(a), then the effect of the proviso to § 420d, just cited and quoted in the note, must be considered. I agree that it is "most obscure," and also that it "at least shows a vague intention to discriminate between violence in labor disputes and elsewhere." It may therefore mean in effect that the acts of violence here made a federal crime do not include such acts when occurring in otherwise legitimate activities of bona fide (i.e., non-outlaw) labor organizations. If the word "otherwise" should be omitted from this statement, if the acts of violence themselves render the union activities not legitimate, then the proviso becomes wholly meaningless, since it would then say that union activities are excepted only when they do not violate the act. Yet it was clear legislative history that this and the exceptions of §§ 420a(a) and 420b(b) discussed in the opinion were drafted by or for the great labor organizations, and the original bill was held up in both House and Senate until these provisions satisfactory to labor interests could be prepared and added. 78 Cong.Rec. 5859, 10867, 11402-3, 11482; H. R. 1833, 73d Cong., 2d Sess., 1934. This is not to legitimatize violence; for the legislative issue was whether the federal criminal jurisdiction should be greatly expanded—in ways unknown to the founding fathers or their descendants prior to 1934—because state processes were ineffective or had broken down. To meet what was thought to be an emergency, there were passed the series of about a dozen acts, among which were this act and the amended kidnapping, the fugitive felon, and the stolen property acts.[3] The proviso therefore may simply mean in effect that the emergency did not extend to even violent acts in furthering legitimate union activities; control or punishment of them should still remain with the states, as under N.Y. Penal Law, Consol.Laws, c. 40, §§ 850-852. Perhaps final interpretation should not now be attempted, but as at present advised I think conviction cannot be had where the acts or threats complained of are part of an endeavor of members of bona fide labor organizations to carry out their otherwise legitimate objects.

AUGUSTUS N. HAND, Circuit Judge (dissenting in part).

I agree that the convictions for violation of the Sherman Act should be reversed for the reasons stated in the majority opinion. But I think that the convictions under the Anti-Racketeering Act should be affirmed except perhaps in some instances where the evidence may have been of insufficient weight. The majority opinion, however, proceeds on the theory that the instructions of the trial judge were so insufficient or misleading as to call for reversal. With this I do not agree.

Under the Anti-Racketeering Act the defendants were indicted for conspiring to violate Section 420a, subdivisions (a), (b) and (c) of Title 18 U.S.C.A., which subject to punishment:

"Any person who, in connection with or in relation to any act in any way or in any degree affecting trade or commerce or any article or commodity moving or about to move in trade or commerce—

"(a) Obtains or attempts to obtain, by the use of or attempt to use or threat to use force, violence, or coercion, the payment of money or other valuable considerations, or the purchase or rental of property or protective services, not including, however, the payment of wages by a bona-fide employer to a bona-fide employee; or

---

[2] 18 U.S.C.A. § 420d: "Any person charged with violating section 420a of this title may be prosecuted in any district in which any part of the offense has been committed by him or by his actual associates participating with him in the offense or by his fellow conspirators: Provided, That no court of the United States shall construe or apply any of the provisions of sections 420a to 420e of this title in such manner as to impair, diminish, or in any manner affect the rights of bona-fide labor organizations in lawfully carrying out the legitimate objects thereof, as such rights are expressed in existing statutes of the United States. (June 18, 1934, c. 569, § 6, 48 Stat. 980.)"

[3] Cf. Cummings, Immediate Problems for the Bar, 20 A.B.A.J. 212; Chamberlain, Federal Criminal Statutes, 1934, 20 A.B.A.J. 501; 48 Harv.L.Rev. 489; 1 Law & Contemp.Prob. 399, 445; 21 Va.L.Rev. 568.

"(b) Obtains the property of another, with his consent, induced by wrongful use of force or fear, or under color of official right; or

"(c) Commits or threatens to commit an act of physical violence or physical injury to a person or property in furtherance of a plan or purpose to violate subsections (a) or (b) * * *".

I agree that subdivision (a) of Section 420a contains an exemption from liability under the act which may reasonably, if not necessarily, be regarded as implicit in subdivisions (b) and (c), but I think that the scope of the exemption is not such as to relieve defendants from prosecution who obtained money by threats without earning wages for any real work even though they might have been willing to accept employment if the operators of the trucks had consented to engage them. Though acts of force, violence or coercion accompanying a labor dispute are sometimes condoned because of ultimate social gains, it nevertheless is true that they are plainly serious violations of law and would surely fall within the prohibitions of the Anti-Racketeering Act if the jurisdictional requirements existed and the exemption in subdivision (a) did not apply.

It is argued in the prevailing opinion that the exemption applies if the defendants though extorting money from the operators by coercion tendered their services in good faith. This is said to be so because "a bona fide tender is the only step that the putative employee can ever take towards performance" and because "guilt is personal to the wrong-doer [and] it would be absurd to make it depend upon the fact that the employee had not gratuitously persisted in pressing his unwelcome services upon the employer." My answer is that the employee is ex hypothesi a law breaker who has used violence or coercion to extort money and that money which he has not worked to earn is not wages nor paid as such. Only "payment of wages" is excepted under subdivision (a) from the penalties of the act. He does not come within the terms of the subdivision. I see no reason for enlarging its terms by implication for his benefit even if some other person, who had gone far enough through the same unlawful means to obtain the status of an employee, would come within the exemption.

It may be added that Congress may have determined to exempt men from prosecution under the Anti-Racketeering Act who actually obtain a status as employees, even though the status is secured by coercion, but not to grant exemption to men who have done nothing but "shake down" prospective employers without rendering any service. The one policy would tend to preserve an employer-employee relation when once established, while the other would involve toleration of intermittent acts of brigandage resulting in no ascertainable advantage.