**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**AURORA CITY LINES, INC., Respondent.**

**No. 13465.**

United States Court of Appeals Seventh Circuit.

Feb. 2, 1962.

Marcel Mallet-Prevost, Asst. Gen. Counsel, A. I. Mendelsohn, Atty., Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Melvin Pollack and H. M. Levy, Attys., N. L. R. B., Washington, D. C., for petitioner.

Fred M. Petit, Chicago, Ill., for respondent.

Before HASTINGS, Chief Judge, and DUFFY and SCHNACKENBERG, Circuit Judges.

HASTINGS, Chief Judge.

The National Labor Relations Board (Board) has petitioned under section 10 (e) of the National Labor Relations Act, as amended [1] for enforcement of its or-

I. 29 U.S.C.A. § 160(e).

der issued against respondent, Aurora City Lines, Inc. (Aurora), on March 3, 1961.[2] The Board concluded that Aurora's operations "affect commerce" and otherwise meet the Board's standards for assertion of its jurisdiction. As to the unfair labor practice, the Board found that Aurora had violated sections 8(a) (1) and (3)[3] of the Act by discriminatorily suspending employee Tester for engaging in the protected concerted activity of circulating a petition for, and otherwise seeking to set up, a special union meeting.

Aurora is an Illinois corporation engaged in the operation of a local passenger transit system by bus and is a wholly owned subsidiary of National City Lines, Inc. During 1959, Aurora's gross volume of business amounted to approximately $400,000, derived almost exclusively from passenger fares. In addition, Aurora purchased locally materials valued at approximately $2,000, all of which originated outside the State of Illinois.

Aurora and Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, Local 215 (Union) were parties to a collective bargaining agreement which was to expire December 31, 1959. Before the expiration date, Union notified Aurora that it desired to terminate the agreement and negotiate a new one. Two negotiating sessions were held during the month of December, but no new agreement was executed prior to the expiration date. The existing contract was continued on a day-to-day basis with the understanding that any benefits conferred by a new agreement would be retroactive to the date the previous contract was terminated.

Some employees felt that they were not being adequately informed by their Union concerning the negotiations for the new contract. On Sunday, January 3, 1960, employees Tester, Donahue, Smithy and Kretch discussed this matter and decided to circulate a petition among other bus driver employees, requesting Union officials to call a special meeting to advise employees of the current status of the negotiations. The four employees signed their names to a blank piece of paper, Tester's name appearing first. About 12 more bus drivers signed the paper that afternoon, after its purpose had been explained to them.

That evening, pursuant to previous arrangements, the drivers who had signed the petition met at Aurora's garage. After securing additional signatures to the petition, Tester telephoned Freddie Leonard, a member of the Union's negotiating committee, and asked that a union meeting be held. Leonard said that he had nothing more to do with the negotiations and suggested that Tester call Herb Wolfram, the president-elect of the Union. Tester called Wolfram and explained to him that "the fellows are a little in the dark as to what has been going on at the negotiations," and that 26 employees had signed a petition for a special union meeting. Tester requested that Wolfram arrange such a meeting, but Wolfram rejected this request. He stated that it was none of Tester's business, called him a "wise punk" and threatened "to have [his] job in the morning."

Following Wolfram's refusal to call a special meeting, there was some talk among the drivers at the garage that Wolfram's refusal might lead to a strike, but no decision to strike was reached or seriously considered. After Tester's failure with Wolfram, Smithy called Wolfram to ask him to "come down and talk to the guys." In the course of the conversation, and after a second refusal by Wolfram, Smithy stated: "Well, now, what it is leading up to, they are just liable to pull the buses off with all these guys down here."

Shortly after these telephone conversations with Wolfram, R. H. Feahr, superintendent of Aurora's bus operations, arrived at Aurora's garage, asked all

2. The Board's Decision and Order are reported at 130 NLRB No. 101.

3. 29 U.S.C.A. §§ 158(a) (1), (3).

drivers except Tester to leave and asked Tester to come into his office.

In the presence of Aymar, Aurora's maintenance superintendent, Feahr requested Tester to sign a resignation form. Tester refused, saying that he had done nothing wrong. Feahr said he had been informed that Tester was "going to pull the buses off the street." Tester explained that he was only trying to get a union meeting. Feahr ignored Tester's explanation and said he would give him a good recommendation if he resigned quietly. Otherwise, he declared, Tester would be suspended, which would do him no good because the Union would not back him and he might be prosecuted for violation of "Taft-Hartley" or for breach of contract. Tester repeated that he was not fomenting a strike, and that the contract between Aurora and Union had expired. Aymar, at this point, remarked that they would enjoy the next few weeks "watching people spend their money uselessly in trying to keep themselves out of jail," that Aurora had more money than Tester, and that by the time he was through Tester would be sorry he had not resigned. Feahr added that Tester would never be able to support his wife and family if he did not resign. Tester then requested that he be permitted to think the matter over until the following morning.

The next morning, Tester told Feahr he had talked the matter over with his wife and, as he had done nothing wrong, he had decided to accept a suspension. Tester was then suspended indefinitely.

Aurora contends that the Board improperly asserted jurisdiction over its operations, that there was no substantial evidence to support the Board's findings that Tester made no threat to pull the buses off the streets and that at the time Feahr suspended Tester, Feahr was well aware that no strike was imminent. It further contends that the record, taken as a whole, shows that Aurora suspended Tester because he was one of a group which, though seeking a lawful objective, namely, a special union meeting, engaged in an unprotected activity, the threatening or promoting of a wildcat strike to gain the objective.

■ In attacking the Board's jurisdiction, Aurora asserts that the doctrine *de minimis* should be applied to its purchase of $2,000 worth of materials, originating outside the State of Illinois. We do not agree. In National Labor Relations Board v. Suburban Lumber Co., 3 Cir., 121 F.2d 829 (1941), the *de minimis* doctrine was urged to defeat the Board's jurisdiction. In rejecting this argument, the court stated: "De minimis in the law has always been taken to mean trifles —matters of a few dollars or less." Id. at 832. The time has not yet arrived when $2,000 is but a trifle.

The Board's jurisdictional finding is further supported by the fact that Aurora's operations are typical of transit operations all over the country. As stated by the Supreme Court in Polish Alliance of U. S. of North America v. National Labor Relations Board, 322 U.S. 643, 648, 64 S.Ct. 1196, 1199, 88 L.Ed. 1509 (1944): "Whether or no practices may be deemed by Congress to affect interstate commerce is not to be determined by confining judgment to the quantitative effect of the activities immediately before the Board. Appropriate for judgment is the fact that the immediate situation is representative of many others throughout the country, the total incidence of which if left unchecked may well become far-reaching in its harm to commerce."[4] We hold that the Board did not err in asserting jurisdiction over Aurora.

■ It is not disputed that circulating the petition and seeking a special Union meeting, though not under the aegis of a union, were protected activities within

---

4. In Charleston Transit Company, 123 NLRB 1296 (1959), the Board decided that it will effectuate the policies of the Act to assert its jurisdiction over all transit systems which do a gross volume of business of at least $250,000. Aurora's gross volume of business amounting to $400,000 meets this jurisdictional standard.

the meaning of section 7 of the Act.[5] See Salt River Val. W. User's Ass'n v. National Labor Relations Board, 9 Cir., 206 F.2d 325, 328 (1953); National Labor Relations Board v. Kearney & Trecker Corp., 7 Cir., 237 F.2d 416, 420 (1956).

■ The remaining contentions of Aurora are controlled by section 10(e) of the Act[6] which provides: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." In elaborating on this statutory command, this court has stated: "It is the function of the Board as the trier of facts, and not that of a reviewing court, to reconcile the conflicting testimony and to determine the credit or weight to be attached to the testimony of the various witnesses." National Labor Relations Board v. Sawyer Downtown Motors, 7 Cir., 213 F.2d 514, 515 (1954). With these standards for review in mind, we proceed to examine the Board's findings with respect to the unfair labor practice.

The Board concluded that Tester did not threaten to pull the buses off the streets. In support of its contention that this finding is not supported by substantial evidence, Aurora relies primarily on the testimony of Wolfram. His testimony was that Tester had stated in their telephone conversation[7] that "if we didn't call a meeting, he was going to take the buses off at 10 o'clock." Tester denied making this threat and was corroborated by Smithy and Donahue who were standing close to Tester during the conversation. The Board chose to credit the testimony of Tester, Smithy and Donahue and reject that of Wolfram. This finding of the Board meets the statutory test and is thus conclusive.

The Board further found that at the time of Tester's suspension Feahr was well aware that no strike was imminent.

Aurora relies on Feahr's testimony that he received word by telephone from three bus drivers that the group circulating the petition intended to enforce their demand with a strike and that Wolfram related Tester's purported strike threat to Feahr when he telephoned Wolfram. Granting credence to Feahr's testimony, it must be contrasted with the Board's evidence. Wolfram told Feahr that no strike had been authorized. There had never been an unauthorized strike throughout Aurora's history of operations. When Feahr arrived at Aurora's garage he was told by the drivers that they wanted to know "what was cooking." When Feahr accused Tester of fomenting a strike Tester denied any such activity and asserted that he was only interested in a special union meeting.

It is clear to us that the Board based this finding on the fact that Feahr's purported belief in the imminence of a strike was based on hearsay and that all the first-hand information he received was contrary to the hearsay information. The Board's finding that Feahr could not have entertained a good faith belief that a strike was imminent is supported by substantial evidence on the record considered as a whole.

■ The Board's ultimate finding that Tester was discharged for "circulating a petition for, and otherwise seeking a. special union meeting" is supported by substantial evidence.

Having found that the Board's findings of fact are supported by substantial evidence, it is unnecessary to pass upon Aurora's alternative final contention that the record, taken as a whole, shows Tester was suspended for engaging in an unprotected activity.

The Board's order of March 3, 1961 will be enforced.

Order enforced.

---

5. 29 U.S.C.A. § 157.

6. 29 U.S.C.A. § 160(e).

7. Wolfram testified that Tester telephoned him twice, but Smithy and Donahue who were in Tester's presence constantly during the period in question testified that there was only one telephone conversation.