**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Rocco PRANNO and Wayne Seidler,
Defendants-Appellants.**

**Nos. 15710, 15728.**

United States Court of Appeals
Seventh Circuit.

Sept. 27, 1967.

Rehearings Denied Nov. 3, 1967.

Richard H. Devine, Jason E. Bellows, Chicago, Ill., for appellants.

Edward V. Hanrahan, U. S. Atty., John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., Gerald M. Werksman, David P. Schippers, Asst. U. S. Attys., of counsel, for appellee.

Before HASTINGS, Chief Judge, CASTLE and FAIRCHILD, Circuit Judges.

FAIRCHILD, Circuit Judge.

Defendants were convicted under the Hobbs Act,[1] providing for the punishment of anyone who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by * * * extortion or * * * conspires so to do".

1. 18 U.S.C., sec. 1951.

Condensing the indictment, it charged defendants with a conspiracy so forbidden by threatening the owner and contractor of a proposed manufacturing plant at Northlake, Illinois, that the building permit would not be issued until $20,000 was paid.

There was ample evidence that defendant Seidler, an alderman, defendant Anderson, the building commissioner, and defendant Pranno conspired with a civil engineer named McCabe. The gist of it was that International Paper Company, the owner, and Perini Corporation, the contractor, would be told that Anderson would not issue the permit until McCabe reviewed and reported favorably on the plans and that McCabe would charge a fee of $20,000 (later reduced to $16,000). The proceeds were to be split among the conspirators.

Although the money was paid, and the permit obtained, it is clear that if the permit had been withheld to fulfill the threat the construction and operation of the plant would have been delayed. Shipment into Illinois of building material and the raw material for the proposed product would have been delayed as well as shipment of products of the plant outside of Illinois.

Defendants Pranno and Seidler, on appeal, do not really challenge the sufficiency of the evidence to prove that they conspired, successfully, to extort $16,000. They do argue that what they did was not a violation of the Hobbs Act, and they claim error upon the trial.

1. *Scope of the Hobbs Act.* Withholding the building permit would delay construction and the beginning of production. The interstate movement of building materials, raw materials, and finished goods would be correspondingly delayed. This was the type of effect on interstate commerce shown in this case.

Defendants argue that this is not as immediate or direct an effect upon interstate commerce as Congress intended to proscribe. They contend the statute forbids only such activity as obstructs, delays, and affects the actual transportation of articles or commodities. They cite statements in congressional debate in 1946, prior to enactment of the so-called Hobbs Act, indicating a purpose to deal with interference by members of labor unions with motor vehicles engaged in interstate commerce. The quoted statements must, however, be viewed in the context of expanding the coverage of legislation already in effect so as to cover activities which the Supreme Court had previously held were not within the former act.[2]

The Supreme Court has made it clear that the statute is to be construed broadly and is not limited to conduct which directly and immediately obstructs a particular movement of goods in interstate commerce. Extortion by threat to disrupt a local activity the stoppage of which would in turn result in stoppage of interstate shipment of raw materials essential for that activity falls within the act.[3] The statute seems to be read as not only prohibiting the obstruction of commerce by extortion, but also prohibiting extortion by any threat, the carrying out of which would obstruct commerce. We have no doubt of its coverage here.

2. *Specific intent to commit a federal crime.* Defendants seem to contend that it must be proved that defendants contemplated and intended that interstate commerce would be affected.

All that must be proved, however, is that defendants conspired to commit extortion, and that the natural effect of carrying out their threat, wheth-

**2.** United States v. Local 807, etc. (1942), 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004.

**3.** Stirone v. United States (1960), 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252. See United States v. Kramer (7th Cir. 1966), 355 F.2d 891, 896–897, cert. den., remanded in part on other grounds, 384 U.S. 100, 86 S.Ct. 1366, 16 L.Ed. 2d 396.

er they were conscious of it or not, would affect commerce.[4]

■ 3. *Other contentions.* Defendants say there was no proof that any interstate commerce was affected or delayed. The charge being conspiracy, however, it was only necessary to prove that delay would have been caused had the owner and contractor refused payment and defendants carried out their threat to withhold the permit.

■ Defendants assert that it was improper for the government to offer evidence that products of this plant were shipped into other states. They say this effect on commerce was not alleged in the indictment. On the contrary, the indictment did allege that such items would be produced and shipped to other states.

■ Defendants contend that the payment was a bribe to influence official action and therefore cannot involve extortion. It might be solely a bribe and not extortion if the record showed that the issuance of the permit was illegal, but defendants offered to issue one in return for money. McCabe did tell representatives of the owner and contractor he could recommend that a drainage basin be required, and there was no room on the property for such a thing. It is not suggested that the drainage basin was a mandatory requirement. The testimony readily supports the inference that the idea of a drainage basin was just a device for applying duress. Under these circumstances the demand for payment was extortion whether or not it was a violation of a statute on bribery.

4. *Eppley's conversation with Seidler.* The $16,000 was paid November 14, 1960 after several weeks of negotiations. Eppley became city manager November 1. Eppley testified, on behalf of the government, that on November 5 Seidler asked Eppley what he intended to do about certain things he had observed and was changing.

"He told me that he collected money from various people having business with the city, and what did I want, if anything.

"I told him that I was going to call the shots as I saw them and I had no choice but to do this in my job, and that my salary of $1,000 a month was adequate."

Seidler then said that he needed $5,000 a year above his salary and that if Eppley was going to upset things he would run for the paid job of City Clerk.

Pranno claims that Seidler's statement was not in furtherance of the object of the conspiracy as alleged in the indictment.

■ It seems a fair interpretation that Seidler was sounding Eppley out in order to make some arrangement with him to secure a benevolent attitude toward this and possibly other conspiracies. The testimony was admissible against Seidler's co-conspirator.

■ When asked what he did after this conversation, Eppley ultimately replied that he applied for a job elsewhere. The court said: "Very good." Defendants claim this remark was prejudicial, conveying the judge's approval of Eppley and his course of action. The context, however, shows that immediately before that answer, Eppley had begun several unresponsive answers, objections to which were sustained. The "very good" appears to have meant only that the answer just given, unlike the preceding ones, was responsive and unobjectionable. The remark was doubtless so understood by the jury.

The judgments are

Affirmed.

4. United States v. Varlack (2d Cir. 1955), 225 F.2d 665, 672.