**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Casimir STASZCUK, Defendant-Appellant.**

No. 73–1869.

United States Court of Appeals, Seventh Circuit.

Argued En Banc Feb. 18, 1975.

Decided May 16, 1975.

Certiorari Denied Oct. 6, 1975. See 96 S.Ct. 65.

54

Warren D. Wolfson, Sherman C. Magidson, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Gary L. Starkman, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, and SWYGERT, CUMMINGS, PELL, STEVENS, SPRECHER, TONE and BAUER, Circuit Judges.

STEVENS, Circuit Judge.

Count III of the indictment[1] charged that on December 8, 1970, appellant did obstruct, delay and affect commerce as defined in the Hobbs Act[2] by extorting $3,000 from a person named Allen.[3] The government proved that defendant received the $3,000 and that he did not oppose a subsequent zoning change authorizing the construction of an animal hospital. However, no such hospital was ever built. Therefore, there is no evidence that either the zoning change or the payment had any effect whatsoever, either favorable or unfavorable, on interstate commerce. The question presented is whether the federal statute reaches this extortion.

The question is novel and significant. The extraordinary growth of federal criminal litigation poses a serious threat to the quality of federal justice; moreover, this growth may not only reflect but also contribute to the continuing transfer of power from the several states to the national government. Since we have no desire to accelerate this trend unnecessarily, we approach the question with a special regard for appellant's claim that the federal prosecutor has overreached the proper limits of his jurisdiction. The importance of the issue merited the fresh consideration of the court sitting en banc. It should be decided neither by simple extrapola-

---

1. The disposition of the remaining counts is explained in the panel opinion reported at 502 F.2d 875 (7th Cir. 1974).

2. Act of July 3, 1946, c. 537, 60 Stat. 420. The statute as codified in 18 U.S.C. § 1951, provides, in pertinent part:

    "(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

    "(b) As used in this section—

    \* \* \* \* \* \*

    (2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

    (3) The term 'commerce' means . . . all . . . commerce over which the United States has jurisdiction."

3. The charging paragraph in Count III of the indictment reads as follows:

    "On or about December 8, 1970, at Chicago, in the Northern District of Illinois, Eastern Division,

    CASIMIR STASZCUK,

    the defendant, knowingly, wilfully and unlawfully did obstruct, delay and affect commerce, as defined by Section 1951(b)(3) of Title 18 of the United States Code, by means of extortion. More specifically, defendant, a public official, obtained property not due either him or his office, in the form of $3,000., paid partly by check and partly by cash, from Al C. Allen, with his consent being induced under color of official right. This payment was made because Allen believed and feared that he would be unable to procure a zoning change on property located on Pulaski Road between 56th Place and 57th Street, in the Thirteenth Ward of Chicago, unless he compensated defendant to refrain from objecting to such a change as a member of the Chicago City Council;

    "In violation of Title 18, United States Code, Section 1951."

tion from the precedents on which the government relies nor by merely distinguishing the cases which have not yet carried us this far.

We first restate the essential facts and then explain why we believe that a fair consideration of the statutory purpose and its constitutional predicate require that the district court judgment be affirmed.

## I.

In September, 1970, William Harris planned to build an animal hospital on property located in the 13th ward of the City of Chicago. As then zoned, such a use of the land was prohibited. Harris therefore paid $5,500 to Al C. Allen, who had acquired a reputation as "the zoning man";[4] Allen talked to defendant Staszcuk, who was then serving as alderman of the 13th ward; on September 15, 1970, an amendatory ordinance was introduced in the City Council.

On December 8, 1970, the zoning man paid the alderman $3,000. On that date the alderman participated in the public hearing on the proposed ordinance, questioning objectors and, at least implicitly, supporting the proposal. Following the public hearing on December 8, pursuant to customary procedure, the zoning committee deferred action on the matter. A few weeks later, on January 27, 1971, the ordinance was approved by the committee and adopted by the City Council. Harris was thereafter free to construct his animal hospital.

In March, Harris received bids from three contractors. For reasons not explained in the record, however, the veterinarian apparently changed his plans and the hospital was never built. Instead, Harris improved his property with construction that would have been permitted before the zoning ordinance was amended.

The estimator for one of the three contractors testified that in his judgment construction of the animal hospital would have required the use of components manufactured outside of the State of Illinois.[5] Neither of the other bidders testified. The nexus between the extortion and interstate commerce may therefore be described thusly: the extortion eliminated the alderman's possible opposition to the removal of a restriction which prevented Harris from building the hospital; if Harris had not changed his plans, the construction of the hospital would have involved the use of out-of-state materials. The jury found this nexus sufficient under the trial court's instructions on the commerce issue.[6] A panel of this court originally concluded that it was too tenuous and reversed the conviction on Count III. After reargument and reconsideration we now affirm that conviction.

## II.

The present form of the statute is a codification of a 1946 enactment, the Hobbs Act, which amended the so-called "Federal Anti-racketeering Act of

---

4. The witness Prokop referred to Allen as "the zoning man." (Tr. 174.) When asked to explain how she heard about Allen, she stated that she had read about him in the papers and she went in to see him "because he was always zoning." (Tr. 177).

5. Specifically, the contractor whose estimator testified would have used cast iron plumbing fixtures, plate glass, electrical fixtures, and a furnace manufactured elsewhere. Since the witness's testimony was predicated on his company's experience in the construction of four comparable animal hospitals in the preceding five years and his general knowledge of the industry, and since he was not aware of any Illinois sources for these items, the jury

could fairly infer from the testimony that the other contractors would also have found it necessary to use components manufactured outside of Illinois.

6. After explaining the meaning of "extortion under color of official right," the trial judge stated:

"It is not necessary for you to find that the defendant Staszcuk knew or intended that his actions would affect, delay or obstruct commerce or the movement of any article in commerce; it is only necessary that the natural effect of the act committed by him, whether he was conscious of it or not, would be to affect, delay or obstruct commerce." (Tr. 585–586)

1934." [7] The 1946 amendment was intended to encompass the conduct held to be beyond the reach of the 1934 Act by the Supreme Court in United States v. Local 807, 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004.[8] It was a broadening amendment concerned primarily with the proper differentiation between "legitimate" labor activity and labor "racketeering." It is, therefore, appropriate to consider the legislative purpose in enacting the 1934 Act in addressing the issue presented by this case.

That purpose was described in Judge Learned Hand's opinion for the majority of the Circuit Court of Appeals in the *Local 807* case as follows:

In conclusion we may add that a consideration of the evil at which Congress was aiming, seems to us to confirm the construction we are putting upon what it said. For a number of years before 1934—at least in the City of New York—the levy of blackmail upon industry, especially upon relatively small shops, had become very serious, and the local authorities either would not, or could not, check it. The courts were powerless, because the witnesses were terrorized and could not be protected if they told what they knew; the public felt themselves at the mercy of organized gangs of bandits and became much wrought up over the situation. It was, at least primarily, to check such Camorras that Congress passed this measure.

United States v. Local 807, 118 F.2d 684, 687–688 (2d Cir. 1941).

■ A description of the statute as designed to eliminate the "levy of blackmail upon industry, especially upon relatively small shops," casts a revelatory light on the problem presented by this case. An effective prohibition against blackmail must be broad enough to include the case in which the tribute is paid [9] as well as the one in which a victim is harmed for refusing to submit. Since the payment would normally enable the business to continue without interruption,[10] the inference is inescapable that Congress was as much concerned with the threatened impact of the prohibited conduct as with its actual effect.

■ Moreover, congressional concern was not merely a matter of providing federal protection to each of the "relatively small shops" being victimized, but rather reflected the legislative judgment that these entrepreneurs, in the aggregate, represented a component of indus-

7. The original statute is found at 48 Stat. 979–980, the 1946 amendment at 60 Stat. 420, and the 1948 codification at 18 U.S.C. § 1951.

8. That case involved the construction of the exemption for "the payment of wages by a bona fide employer to a bona fide employee," which is no longer a part of the statute.

9. Counts I and II of this case; and Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252; Nick v. United States, 122 F.2d 660 (8th Cir. 1941), cert. denied, 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550; Hulahan v. United States, 214 F.2d 441 (8th Cir. 1954), cert. denied, 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675; United States v. Floyd, 228 F.2d 913 (7th Cir. 1956), cert. denied, 351 U.S. 938, 76 S.Ct. 835, 100 L.Ed. 1466; United States v. Pranno, 385 F.2d 387 (7th Cir. 1967), cert. denied, 390 U.S. 944, 88 S.Ct. 1028, 19 L.Ed.2d 1132, and United States v. Hyde, 448 F.2d 815 (5th Cir. 1971), cert. denied, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745, are examples of such cases. Speaking for our court in *Pranno*, Judge Fairchild stated:

"The statute seems to be read as not only prohibiting the obstruction of commerce by extortion, but also prohibiting extortion by any threat, *the carrying out of which would obstruct commerce.* We have no doubt of its coverage here." 385 F.2d at 389 (Emphasis added.)

10. Of course, the payment of the extortion demand may, in some cases, have a direct actual effect on interstate commerce by reducing the assets available for the purchase of goods originating in other states. *See, e.g.*, United States v. Gill, 490 F.2d 233 (7th Cir. 1973), cert. denied, 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1139; United States v. DeMet, 486 F.2d 816 (7th Cir. 1973), cert. denied, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558, and United States v. Augello, 451 F.2d 1167 (2d Cir. 1971), cert. denied, 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802. In this case, however, the government does not contend that the $3,000 payment so depleted the resources of either Allen or Harris.

try of sufficient importance to merit federal protection. The concern which gave rise to the statute is marketwide. Thus, although enforcement necessarily proceeds on a case-by-case basis, our evaluation of both the intent of Congress and its power to implement that intent, requires more than a consideration of the consequences of the particular transaction disclosed by this record; it requires an identification of the consequences of the class of transactions of which this is but one example.[11]

The statute is not regulatory in character but instead is intended to remove artificial restraints on the free flow of goods. The elimination of "blackmail upon industry" can have no inhibitory effect on interstate commerce; it can only facilitate the operation of a free economy. Like the Sherman Act, which is broadly directed against private regulation of the free market, and which has been construed as an exercise by Congress of "all the power it possessed" to prevent restraints on commercial competition, see Apex Hosiery Co. v. Leader, 310 U.S. 469, 495, 60 S.Ct. 982, 84 L.Ed. 1311, and Atlantic Cleaners & Dyers v. United States, 286 U.S. 427, 435, 52 S.Ct. 607, 76 L.Ed. 1204, the purpose of the Hobbs Act parallels the central purpose of the Commerce Clause itself.

That central purpose was described in these words by Justice Rutledge:

If any liberties may be held more basic than others, they are the great and indispensable democratic freedoms secured by the First Amendment. But it was not to assure them that the Constitution was framed and adopted. Only later were they added, by popular demand. It was rather to secure freedom of trade, to break down the barriers to its free flow, that the Annapolis Convention was called, only to adjourn with a view to Philadelphia. Thus the generating source of the Constitution lay in the rising volume of restraints upon commerce which the Confederation could not check. These

were the proximate cause of our national existence down to today.

As evils are wont to do, they dictated the character and scope of their own remedy. This lay specifically in the commerce clause. No prohibition of trade barriers as among the states could have been effective of its own force or by trade agreements. It had become apparent that such treaties were too difficult to negotiate and the process of securing them was too complex for this method to give the needed relief. Power adequate to make and enforce the prohibition was required. Hence, the necessity for creating an entirely new scheme of government.

\*     \*     \*     \*     \*     \*

So by a stroke as bold as it proved successful, they founded a nation, although they had set out only to find a way to reduce trade restrictions. So also they solved the particular problem causative of their historic action, by introducing the commerce clause in the new structure of power.

W. Rutledge, A Declaration of Legal Faith, at 25–26 (1947).

■ The primary purpose of the Commerce Clause was to secure freedom of trade, to break down the barriers to its free flow, and to curtail the rising volume of restraints upon commerce that the Articles of Confederation were inadequate to control. A statute which has a purpose which so unambiguously parallels the fundamental purpose of its constitutional predicate must receive an expansive construction.

It is, therefore, not surprising to find that the language of the statute, its legislative history, and its interpretation by the Supreme Court all confirm an intent by Congress to exercise its full powers under the Commerce Clause. The definition of the word "commerce" in the 1934 Act encompassed "all other trade or commerce over which the United States

11. *Compare* United States v. Walker, 489 F.2d 1353, 1357 (7th Cir. 1973), cert. denied, 415 U.S. 982, 94 S.Ct. 1574, 39 L.Ed.2d 879.

has constitutional jurisdiction." [12] The Senate Report approvingly quoted a Department of Justice memorandum stating that the proposed statute was designed "to extend Federal jurisdiction over all restraints of any commerce within the scope of the Federal Government's constitutional powers." *See* S.Rep. No. 532, 73rd Cong., 2d Sess. at 1 (1934). And, as has often been noted, in Stirone v. United States, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252, the Supreme Court expressly stated that the broad language of the Hobbs Act manifests "a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence."

■ Against this background, we have no alternative but to conclude that Congress intended the Hobbs Act to apply to a case such as this and that it had ample power to effectuate that intent.

### III.

■ There was no need to prove that the extortion was actually intended to obstruct or to affect interstate commerce. The commerce element of the Hobbs Act violation is jurisdictional.

Recently the Supreme Court removed such doubt as theretofore existed about the prosecutor's burden of proving "antifederal scienter." *See* United States v. Feola, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975).[13]

We are also persuaded that the cases which uniformly hold that a threatened effect on interstate commerce is sufficient to bring the statute into play notwithstanding the absence of any actual effect, correctly interpret the congressional purpose.[14] Finally, we have no doubt that the extortion revealed by this record is a species of the "blackmail upon industry" which Congress mustered its full power to eradicate. The muscle of the faithless public servant is just as intolerable as the muscle of the Camorras described by Judge Hand.[15]

■ This does not mean, however, that we may ignore the constitutional limits on the power of the national government. Nor may we disregard the statutory language which requires the prosecutor to prove some connection with interstate commerce in every case.[16] We hold, however, that the commerce element of a Hobbs Act violation—the

12. 48 Stat. 979. Moreover, in describing the requisite effect on commerce, § 2 of the 1934 Act broadly referred to activity "in connection with or in relation to any act in any way or in any degree affecting trade or commerce or any article or commodity moving or about to move in trade or commerce . . . ."

13. Speaking of 18 U.S.C. §§ 111 and 371, the Court stated:

"The jurisdictional requirement is satisfied by the existence of facts tying the proscribed conduct to the area of federal concern delineated by the statute. Federal jurisdiction always exists where the substantive offense is committed in the manner therein described, that is, when a federal officer is attacked. Where, however, there is an unfulfilled agreement to assault, it must be established whether the agreement, standing alone, constituted a sufficient threat to the safety of a federal officer so as to give rise to federal jurisdiction. If the agreement calls for an attack on an individual specifically identified, either by name or by some unique characteristic, as the putative buyers in the present case, and that specifically identified individual is in fact a federal officer, the agreement may be fairly characterized as

one calling for an assault upon a federal officer, even though the parties were unaware of the victim's actual identity and even though they would not have agreed to the assault had they known that identity." 420 U.S. at ——, 95 S.Ct. at 1269.

14. See the cases in n. 9, *supra*.

15. *Compare* Mr. Justice Clark's reference to "a betrayal of public trust of the most alarming type to a free society" in his opinion in United States v. Braasch, 505 F.2d 139, 141 (7th Cir. 1974), cert. denied, 421 U.S. 910, 95 S.Ct. 1562, 43 L.Ed.2d 775 (1975).

16. The language of this statute does not permit us to treat it as a determination that since the class of activities giving rise to federal concern has an adverse effect on commerce, Congress intended any activity within the class to be subject to prosecution without the necessity of any showing of an actual or potential effect on commerce in the particular case. *Compare* United States v. Hunter, 478 F.2d 1019, 1020–1021 (7th Cir. 1973), cert. denied, 414 U.S. 857, 94 S.Ct. 162, 38 L.Ed.2d 107.

federal jurisdictional *fact*—may be satisfied even if the record demonstrates that the extortion had no actual effect on commerce.[17] Congressional concern is justified by the harmful consequences of the class of transactions to which the individual extortion belongs, and jurisdiction in the particular case is satisfied by showing a realistic probability that an extortionate transaction will have some effect on interstate commerce.[18]

■■■■ The jurisdictional inquiry must, of course, focus on the situation at the time of the offense. In this case the crime occurred on December 8, 1970. No actual effect on commerce occurred either before or after that date. It was, nevertheless, entirely reasonable for the jury, assessing probabilities as of that time, to find that a potential effect on commerce had been proved. The jury could reasonably infer that, as a result of the extortion on that date, there was then a likelihood that the movement across state lines of a furnace, plate glass, and plumbing and electrical fixtures would be affected. The events which occurred after December 8, 1970, the evidence concerning the interested parties' plans and expectations, and the contractor's testimony about the need to use out-of-state components to build an animal hospital in Illinois were all relevant to the commerce issue. Contrary to the prosecutor's view, however, we do not think appellant's guilt or innocence may be determined entirely on the basis of the intent of the property owner or the zoning man; nor, on the other hand, do we think federal jurisdiction is defeated by the fortuitous circumstance that, after the crime had been committed, a change of plans occurred and the hospital was never built.[19] Finally, contrary to appellant's argument, even though it is possible that another contractor might have been able to construct the hospital entirely with local materials, the testimony was adequate to support the conclusion that the use of out-of-state components was far more probable. The jury, like Congress, was entitled to assess probabilities.

■■■ The jury was properly instructed on the commerce issue and its verdict is supported by the evidence. The conviction on Count III is affirmed.[20] For the reasons stated in the panel opinion of September 10, 1974, the convictions on Counts IV, V, VI, and VII are reversed and the convictions on Counts I, II, VIII and IX are affirmed.

---

17. The same conclusions apply to the Sherman Act. The federal interest in keeping the market free of artificial restraints justifies a prohibition against an agreement to fix prices even if the agreed price is reasonable, *see, e. g.,* United States v. Trenton Potteries Co., 273 U.S. 392, 397–401, 47 S.Ct. 377, 71 L.Ed. 700, and even if the agreement may result in a lower price in the particular case. *See, e. g.,* Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219. Undoubtedly the illegality would attach even if the defendants could demonstrate that the prevailing price would have been the same without any such agreement. The federal power to protect the free market may be exercised to punish conduct which threatens to impair competition even when no actual harm results. *Cf.* United States v. Finis P. Ernest, Inc., 509 F.2d 1256 (7th Cir. 1975).

18. The instruction in this case required the jury to find that the "natural effect" of the transaction would be to affect commerce. *See* n. 6, *supra.* We find no significant difference between that phrasing and a test phrased in terms of a "realistic probability" of such an effect.

19. Nor would appellant have been any less culpable if for some unanticipated reason the ordinance had not in fact passed on January 27, 1971. Conversely, if on December 8, 1970, no effect on interstate commerce had been foreseeable, a subsequent decision creating an interstate nexus would not retroactively convert a possible state offense into a federal crime.

20. At appellant's request we have again reviewed the transcript of the voir dire examination of prospective jurors. Although we adhere to our original conclusion that the entire examination brought out sufficient information about the seven male jurors (and one male alternate) who were accepted to enable experienced defense counsel to make a reasonably knowledgeable use of their peremptory challenges, we repeat our disapproval of the trial judge's refusal to inquire about the marital status of male jurors or to ascertain the employment status of their spouses.

SPRECHER, Circuit Judge (dissenting).

The court *en banc* has let stand the original panel decision affirming the convictions on Counts I, II, VIII and IX and reversing the convictions on Counts IV, V, VI and VII. United States v. Staszcuk, 502 F.2d 875 (7th Cir. 1974).

Count III, which the panel reversed, has now been affirmed by a majority of the *en banc* court. Inasmuch as the original opinion will retain viability in regard to eight counts, no purpose would be served by repeating the reasons stated therein for originally reversing Count III.

Therefore, I respectfully dissent from the *en banc* affirmance of Count III on the grounds set forth in 502 F.2d at 879 and would reverse that Count.

SWYGERT, Circuit Judge (dissenting).

I concur in Judge Sprecher's dissent. I also dissent from the court's opinion on another ground: the trial judge's handling of the voir dire examination of the prospective jurors.

Judge Stevens, writing for the majority, treats the matter in footnote 20 of his opinion. There he says that upon reviewing the record the court adheres to the original conclusion that the entire examination brought out sufficient information for peremptory challenge purposes, but that the court disapproves "the trial judge's refusal to inquire about the marital status of male jurors or to ascertain the employment status of their spouses." Although the court voices its disapproval, there is no consequence. Apparently the error is chalked up as harmless. This flaw in the examination, along with others I shall mention, was not harmless error in my opinion. Certainly enough has been said by this circuit to make clear to the trial bench the necessity of an adequate voir dire examination and the danger of truncated, hurried procedures which may mitigate against the selection of unbiased, qualified jurors. United States v. Lewin, 467 F.2d 1132 (7th Cir. 1972);

United States v. Dellinger, 472 F.2d 340 (7th Cir. 1972).

As we indicated in United States v. Lewin the voir dire examination should include questions that go beyond what may bring out information that could be the basis for a challenge for cause. It should also include questions relevant to the nature of the case and the identity of the parties that might establish the basis for an informed, intelligent peremptory challenge. Otherwise, the right to exercise challenges preemptorily would be useless. As this court said in United States v. Dellinger: "[If] this right is not to be an empty one, the defendants must, upon request, be permitted sufficient inquiry into the background and attitudes of the jurors to enable them to exercise intelligently their peremptory challenges . . . ." 472 F.2d at 368.

With these pronouncements in mind, how can it be said that information that a prospective juror has previously served as a petit or grand juror in criminal matters is not relevant background for making a peremptory challenge decision. Yet the trial judge here refused to ask the relevant question. As the defendant argues, the failure of the jurors, upon being asked, to express any reason why they could not fairly and impartially try the case might not alert them to unperceived prejudice or bias that previous jury service may have created in their minds. *Cf.* United States v. Martin, 507 F.2d 428 (7th Cir. 1974).

Furthermore, the refusal of the trial judge to inquire about the length of residence of the jurors at their present addresses and about their residence immediately prior thereto deprived the defendant of relevant information concerning the social background of the jurors.

Finally, the trial judge did not ask a question concerning a highly relevant aspect of the jurors' possible experience with zoning matters. He did frame the following question to them:

Now we are going to see if we can find out whether any of you have ever

had any property in which there was some discussion, or maybe more than a discussion, in regard to changing the zoning regulations in regard to this property, and again I see no hands raised, so I am assuming that none of you have ever had property where you had any desire to have the zoning changed.

But more should have been asked. Inquiry should have been made, as defendant requested, as to whether any of the jurors had ever resisted or taken a "position" with respect to any proposed zoning change. Some juror may have had experience, good or bad, with a zoning request that did not affect his real estate directly but did affect indirectly his interests either as an adjacent property owner or a nearby resident. Such information could have been the basis for a peremptory challenge.

A meaningful opportunity for the defendant to exercise his right to peremptory challenges was thus thwarted by the trial judge. The Government argues in its brief:

> In this case, as in all cases, the *voir dire* could have been more elaborate and penetrating. But if the overcrowded criminal docket in this jurisdiction is not to buckle under its own weight, a trial judge who, on the facts presented, does not impinge upon the essential demands of fairness must be accorded leeway in determining when the *voir dire* has produced a fair jury capable of just judgment.

In the first place there was an impingement upon the essential demands of fairness. Secondly, overcrowded criminal dockets are no excuse for such impingement. Given an overcrowded docket, other means could have been utilized to accommodate the need to save time and yet afford fairness. For example, a questionnaire, formulated at a pretrial conference, which would have covered most if not all the relevant questions, could have been furnished the prospective jurors before they were called into the courtroom. Regardless of such suggested solutions, shortcut procedures, as here, do not comport with fair trials. I would reverse and remand for a new trial.

PELL, Circuit Judge (dissenting).

Count Three of the indictment charged that Casimir Staszcuk "did obstruct, delay and affect commerce" . . . "by means of extortion" in violation of 18 U.S.C. § 1951. The statute which was the basis of the indictment reads in pertinent part: "Whoever in any way or degree obstructs, delays, or affects commerce . . . by robbery or extortion . . . ." The evidence adduced by the Government at the trial showed affirmatively that Staszcuk did not obstruct, delay, or affect commerce by the transactions charged in Count Three. Nevertheless, he was convicted on this Count and now a majority of this court, although conceding that the Count Three activity had no effect whatsoever on interstate commerce, have affirmed the conviction. I respectfully dissent from the result reached and while concurring in the dissenting opinion of Judge Sprecher, because of what I regard as a substantially incorrect extension of federal jurisdiction into a localized crime, I feel impelled to add the following comments.

The net effect of the majority decision is to construe the statute to read: "Whoever in any way or degree potentially obstructs, delays, or affects commerce, even though he does not actually obstruct, delay, or affect commerce . . ."

The majority despite its scholarly consideration of what it deems Congress probably intended as the scope of its exercise of constitutional power to regulate commerce, ignores that which Congress did in fact enact. In the recent case of Burns v. Alcala, 420 U.S. 575, 580, 95 S.Ct. 1180, 1184, 43 L.Ed.2d 469 (1975), the Supreme Court referred to the "axiom that words used in a statute are to be given their ordinary meaning in the absence of persuasive reasons to the contrary." The ordinary meanings of the jurisdictional words, "obstruct, delay,

and affect," as detailed in dictionaries of the English language all appear to import the concept of accomplishment, a *fait accompli* rather than a *fait potentiel*.[1] I do not find persuasive reasons for ignoring the ordinary, the plain and explicit, meanings of these key words by equating the breach of trust of a public official which has no actual effect upon commerce and which does not delay or obstruct commerce, as reprehensible as that misconduct may be, with the widespread racketeering at which Congress intended to direct its enactment. I do not read the history quite as does the majority. It seems rather clear to me that Congress was not so much interested in removing artificial restraints on the free flow of goods as it was in striking down an evil which "had become very serious, and the local authorities either would not, or could not, check . . . ." United States v. Local 807, 118 F.2d 684, 687–688 (2d Cir. 1941). That the Hobbs Act which was aimed at a specific evil, is sufficiently broad to catch in its net other extortionists whose nefarious activities do in fact affect commerce does not signify to me an intention on the part of Congress, even if Congress has the constitutional power which is not at all clear, to extend the exercise of legislative power to local activities which have no effect whatsoever on interstate commerce. The determination of whether to prosecute federally what is essentially a local crime when it has some minimal connection with interstate commerce is a matter of prosecutorial policy with which the courts do not ordinarily concern themselves. We are, however, not dealing with a question of prosecutorial policy but rather prosecutorial power which I deem to be lacking.

The portion of the statute which would reach nearest to the applicability point here is "affect commerce." That phrase is not a stranger to other legislation, thus, in the National Labor Relations Act we find the Board being empowered "to prevent any person from engaging in any unfair labor practice . . . affecting commerce." 29 U.S.C. § 160(a).

The use of the word "affect" in the analogous NLRA situation and recognition that Congress intended to indicate the fullest employment of its commerce power authority is discussed in the *en banc* opinion in National Labor Relations Board v. Suburban Lumber Co., 121 F.2d 829, 831–32 (3d Cir. 1941), cert. denied, 314 U.S. 693, 62 S.Ct. 364, 86 L.Ed. 554:

"The National Labor Relations Act uses what have been described as words of art to indicate the fullest employment of this Congressional authority. The selection of the word 'affect' is of recent origin. Although it appears in the language of some of the earlier Supreme Court opinions, it only found its way into relatively new legislation, and so is not present in such statutes as the Federal Trade Commission, the old Employers' Liability Act, and the Sherman Act. They qualify interstate commerce with such words as 'in', 'engage in' or 'restraint', whereas such modern statutes as the National Labor Relations Act, the Bituminous Coal Act, and the new Employers' Liability Act, prefer the more vehement 'affect'. That the word has the widest conceivable scope is apparent both from its dictionary definition and its judicial interpretation. The dictionary says: 'To act upon; produce an effect on; touch', and the cases are equally unanimous in emphasizing this inclusive character and so hold it to mean 'acting upon', 'working a change in' or 'concerning'." (Footnotes omitted.)

That there must be some effect on commerce even though small would appear to be the underlying premise of the Supreme Court's position on the National

---

1. For example from Webster's Third International Dictionary: *affect*—"to produce an effect . . . to produce a material influence upon or alteration in"; *delay*—"to put off . . . to stop, detain or hinder for a time . . . to cause to be slower"; *obstruct*—"to block up . . . to be or come in the way of . . . to cut off from sight."

Labor Relations Act, and I am unaware of any basis for differentiating the Hobbs Act.

"The power of Congress to regulate interstate commerce is plenary and extends to all such commerce be it great or small. Hanley v. Kansas City Southern Ry. Co., *supra* [187 U.S. 617, 619, 23 S.Ct. 214, 47 L.Ed. 333]. The exercise of Congressional power under the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, the Clayton Act, 38 Stat. 730, the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq., or the National Motor Vehicle Theft Act, 18 U.S.C.A. § 408, has never been thought to be constitutionally restricted because in any particular case the volume of the commerce affected may be small. The amount of the commerce regulated is of special significance only to the extent that Congress may be taken to have excluded commerce of small volume from the operation of its regulatory measure by express provision or fair implication.

"The language of the National Labor Relations Act seems to make it plain that Congress has set no restrictions upon the jurisdiction of the Board to be determined or fixed exclusively by reference to the volume of interstate commerce involved. Section 2(6) defines commerce as 'trade, traffic, commerce, transportation, or communication among the several States,' without reference to its volume, and declares in subsection (7) that 'The term "affecting commerce" means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce.' Section 10(a) confers on the Board authority 'to prevent any person from engaging in any unfair labor practice (listed in section 158) affecting commerce.'

"The Act on its face thus evidences the intention of Congress to exercise whatever power is constitutionally given to it to regulate commerce by the adoption of measures for the prevention or control of certain specified acts—unfair labor practices—which provoke or tend to provoke strikes or labor disturbances affecting interstate commerce. Given the other needful conditions, commerce may be affected in the same manner and to the same extent in proportion to its volume, whether it be great or small. Examining the Act in the light of its purpose and of the circumstances in which it must be applied we can perceive no basis for inferring any intention of Congress to make the operation of the Act depend on any particular volume of commerce affected more than that to which courts would apply the maxim *de minimis.*" National Labor Relations Board v. Fainblatt, 306 U.S. 601, 606–607, 59 S.Ct. 668, 671–672, 83 L.Ed. 1014 (1939).[2]

Here the question is not great or small; it is, putting it very simply, some or none. In the language of *Fainblatt,* I can perceive no basis for inferring an

---

**2.** The *de minimis* concept, which by definition would seem to require some effect and which would likewise appear to preclude a jurisdictional basis of no effect at all, was given consideration by this court in the case of Community Currency Exchange, Inc. v. National Labor Relations Board, 471 F.2d 39, 41–42 (7th Cir. 1972):

"It is true, however, as the company urges here, that the Board's broad jurisdiction is limited by the *de minimis* doctrine. The *de minimis* concept, as enunciated in NLRB v. Fainblatt, 306 U.S. 601, 607, 59 S.Ct. 668, 83 L.Ed. 1014 (1939), operates to deny federal jurisdiction where a business's effect on commerce is so negligible that for jurisdictional purposes the enterprise is considered purely local. Although the concept is not susceptible to a mechanical application based upon a business volume formula, the Third Circuit has held that '*de minimis* in the law has always been taken to mean trifles—matters of few dollars or less.' NLRB v. Suburban Lumber Co., 121 F.2d 829, 832 (3d Cir. 1941). We adopted that reasoning in NLRB v. Aurora City Lines, Inc., 299 F.2d 229, 231 (7th Cir. 1962). We do not deem the exchanges' effect on commerce trifling, either from the standpoint of dollar amount or business impact."

intention of Congress to make the operation of the Hobbs Act independent of any effect whatsoever on interstate commerce. Since the ordinary meaning of the words used would indicate that Congress had no such intention, it is, of course, unnecessary to reach the constitutional question of whether Congress would have the power to reach beyond the boundary imposed by a complete lack of any commerce nexus.

The Government in arguing that potential effect on interstate commerce is sufficient relies on United States v. Pranno, 385 F.2d 387 (7th Cir. 1967), cert. denied, 390 U.S. 944, 88 S.Ct. 1028, 19 L.Ed.2d 1132; United States v. Hyde, 448 F.2d 815 (5th Cir. 1971), cert. denied, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745; United States v. Tropiano, 418 F.2d 1069 (2d Cir. 1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970); Hulahan v. United States, 214 F.2d 441 (8th Cir. 1954), cert. denied, 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675, and United States v. Augello, 451 F.2d 1167 (2d Cir. 1971), cert. denied, 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802.

While language in these cases might suggest potential effect was sufficient, the language does not appear to have been necessary to the courts' holdings, although, of course, for the reasons I have indicated herein, to the extent that it was necessary to a holding I believe it incorrect. In Pranno, the defendants told the victim that a building permit would not be issued unless the victim paid them $20,000. Apparently some building material from other states had already been brought into Illinois at the time of the extortion. This court held that there was sufficient connection with interstate commerce. "Withholding the building permit would delay construction and the beginning of production. The interstate movement of building materials, raw materials, and finished goods would be correspondingly delayed. . . The statute seems to be read as not only prohibiting the obstruction of commerce by extortion, but also prohibiting extortion by any threat, the carrying out of which would obstruct commerce." 385 F.2d at 389. The extortion money was paid so that the interstate movement of the goods, in fact, continued.

In Hyde, the defendants, including the Attorney General of Alabama, conspired to extort payments from life insurance companies and small loan companies. On appeal, the defendants argued that some of the companies were not engaged in interstate commerce at the time of the extortion. The Fifth Circuit held that the Hobbs Act nevertheless applied: "The companies were formed, and registration for a stock sale was sought, with a stated purpose of going into the activities that support a finding of interstate commerce. Neither the statute nor the Constitution requires that the company be engaged in an interstate transaction at the moment of the extortion to support federal jurisdiction." 448 F.2d at 836. All of the companies did eventually engage in interstate commerce.

In Tropiano, the defendants, who were engaged in the rubbish collection business, threatened other persons who were involved in the same business with violence if they did not stop soliciting business in the city in which the defendants operated. The victim eventually agreed not to solicit any of the defendants' customers or any further business in the city. At the time of the threats, the victim employed trucks and containers which were manufactured in another state. The Second Circuit held that there was sufficient connection with interstate commerce for the Hobbs Act: "[The victim's] surrender of his right to solicit additional customers in Milford automatically limited his future orders for receptacles for new customers and the trucks required to serve such customers." 418 F.2d at 1076.

In Hulahan, the defendant, a representative of a local labor union, attempted to extort and extorted money from three construction companies by threats of labor trouble. Two of the companies were dependent, for the continuation of the work undertaken by them, upon

equipment, materials, and supplies from other states. The third company was working on the construction of runways at the St. Louis Municipal Airport. The Eighth Circuit held that there was sufficient connection with interstate commerce for the purposes of the Hobbs Act since the companies were dependent upon interstate commerce for materials, etc. or were engaged in constructing facilities to serve interstate commerce.

In *Augello*, the Second Circuit held there was sufficient nexus with interstate commerce since the depletion of the victim's resources, due to the extortion payments, affected the victim's purchase of goods from interstate commerce. The evidence indicated that the victim purchased supplies from another state at the time of the extortion.

In sum, this court is squarely holding in a case, really of first impression, that the Hobbs Act has eliminated the necessity of actual effect on interstate commerce so long as it reasonably appeared at the time of the extortion that there would be such effect. I cannot agree that Congress intended such an extension.[3]

Although I did approve of and concur in the opinion of the panel of this court when the case was first heard, since the matter has been before the court for reconsideration via the *en banc* route, I have reexamined the matter of the voir dire on the basis of the record and in the light of Judge Swygert's dissenting opinion. I am persuaded that the curtailment of sufficient opportunity to determine a proper basis for the selection of a jury was substantial enough to deny the appellant a fair trial. I therefore join in the dissent of Judge Swygert.

---

**3.** While perhaps not dispositive of the legal issue presented by Count Three, two collateral policy reasons suggest themselves for the view of the lack of necessity for straining to find that Congress did extend itself to the extent that the majority opinion finds it did.

(1) In a period of constant study of the problems presented by the overload of cases in the federal courts, and the suggested elimination of some types of jurisdiction, e. g., diversity cases, a limitation on the sweep of jurisdictional claims into local cases might be pertinent for consideration.

(2) The Hobbs Act defendant is quite frequently guilty of other federal violations as to which there is no question. Most frequently it is found for understandable reasons that the amount received has not been reported on income tax returns, thereby presenting a tax evasion case. Also, the Hobbs Act defendant may not have confined himself to one act of extortion but may have engaged in several other such acts as to which there was no question of effect on commerce. This aspect, of course, is not persuasive if the prosecutorial effort is to demonstrate by "throwing the book" that the defendant is guilty of multiple crimes.