**UNITED STATES of America**

v.

**Egidio CERILLI et al.**

**Crim. No. 76–22.**

United States District Court, W. D. Pennsylvania.

Aug. 13, 1976.

Daniel H. Shapira, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

Irving M. Green, New Kensington, Pa., for defendant Cerilli.

Dominic Ciarimboli, Greensburg, Pa., for defendant Buffone.

Thomas R. Ceraso, Greensburg, Pa., for defendant Yakovich.

## OPINION

ROSENBERG, District Judge.

Egidio Cerilli, Ralph Buffone and Maylan Yakovich, defendants in the above entitled case, filed a motion for judgment of acquittal. The motion is in proper order by reason of the fact that an appropriate motion was made immediately after the Government had rested its case, and at the close of all evidence in the case prior to the matter being presented to the jury.

The case commenced trial on April 26, 1976. After approximately three weeks trial, because of an ailment as ascertained by a medical crew at a highly recognized hospital, one of the jurors could not proceed with further deliberation and a motion of the defendants for a mistrial was granted.

The defendants attack the Government's case on its ten count indictment, on its failure to show that interstate commerce was either involved or affected; and additionally, as to the last nine counts variously against the individual defendants, that the evidence as a whole is lacking in the required showing of the three necessary elements: (1) that the defendants induced victims to part with property; (2) that they did so by "extortion"—the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official rights; and (3) that in so doing, interstate commerce was delayed, interrupted or adversely affected.

The first count of the indictment charges all three defendants with conspiracy to violate an Act of Congress as follows:

"From on or about March 2, 1971 continuing to on or about December 1, 1972, in Westmoreland County, in the Western District of Pennsylvania, the defendants, EGIDIO CERILLI, RALPH BUFFONE, MAYLAN YAKOVICH and others whose names to the grand jury are unknown, did unlawfully, knowingly and willfully conspire, combine, confederate and agree together and with each other to obstruct, delay and affect interstate commerce as the term 'commerce' is defined in Section 1951, Title 18 United States Code and the movement of articles and commodities in interstate commerce by extortion, as the term 'extortion' is defined in Section 1951, Title 18 United States Code, that is to say, the defendants, in connection with the Pennsylvania Department of Transportation's practice of leasing equipment from the below listed owners, wrongfully and unlawfully did demand and did cause James C. Poole to pay $3,000, Thomas Altman to pay $200, Ramaley Brothers to pay $700, Earl Keibler-Excavating Contractor to pay $837, Walter G. Seigfried to pay $525, Paul Caletri & Sons Excavation to pay $75 with the consent of each of the above described payors induced by the wrongful use of fear and under color of official right." (Count 1, paragraph 18).

This count then lists the substantive acts upon which the nine additional counts are based as overt acts as the supports for the First Count conspiracy charge.

Count 2 charges the defendant Maylan Yakovich with extorting $200 from Thomas Altman from on or about April 6, 1972 to on or about May 8, 1972. Count 3 charges defendant Egidio Cerilli with extorting $2,000 from James C. Poole from on or about April 1, 1972 to on or about April 15, 1972. Count 4 charges the defendant Egidio Cerilli with extorting $1,000 from James C. Poole from on or about November 1, 1972 to on or about November 22, 1972. Count 5 charges defendant Ralph Buffone with extorting $700 from Ramaley Brothers from on or about April 1, 1971 to on or about April 30, 1971. Count 6 charges defendant Maylan Yakovich with attempting to extort $190 from Ramaley Brothers during April, 1972. Count 7 charges defendant Ralph Buffone with extorting $837 from Earl Keibler-Excavating Contractor from on or about April 1, 1971 to on or about April 28, 1971.

Count 8 charges defendant Ralph Buffone with attempting to extort $750 from Walter G. Seigfried at sometime in late April or early May, 1971. Count 9 charges defendants Maylan Yakovich and Ralph Buffone with extorting $525 from Walter G. Seigfried on or about May 3, 1971. Count 10 charges defendants Egidio Cerilli and Maylan Yakovich with extorting $75 from Paul Caletri & Sons Excavation from on or about April 1, 1972 to on or about April 27, 1972.

The United States instituted this action by an indictment against the defendants, Egidio Cerilli, Ralph Buffone and Maylan Yakovich, by authority of authorization contained in Title 18 U.S.C. § 1951, which in pertinent part reads:

"Interference with commerce by threats or violence

(a) Whoever in any way or degree obstructs, delays or affects commerce or the movement of any article or commodity in commerce by . . . extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both."

In support of their motions for judgment of acquittal, the defendants claim in their combined brief that the prosecutor did not produce competent evidence to confer jurisdiction: first, that the evidence was insubstantial and therefore insufficient for a jury to find the defendants guilty beyond a reasonable doubt on such charges; second, that the prosecution failed to show that interstate commerce was affected; and third, that the prosecution failed to show evidence as to the element of extortion by certain defendants as charged in certain counts; and that, on the whole the prosecution failed to show that any extortion was practiced in violation of the Hobbs Act in order to permit a jury to find a verdict of guilt beyond a reasonable doubt as required by law, as to any count contained in the indictment, but particularly as to the conspiracy charge as contained in Count 1.

All the evidence presented in the case by the prosecution follows substantially closely the charges contained in the indictment, except of course, the conclusionary or inferential evidence required to find that a conspiracy existed in accordance with the charge contained in Count 1 of the indictment. I said that the evidence is set forth substantially as it follows the charges contained in the indictment because on the whole there was evidence to that effect, but by reason of cross-examination the question of credibility of the witnesses became involved. As for instance, in the case of one of the witnesses, a contractor, testified that he had made a statement for the benefit of certain investigators and that he had submitted it to his daughter before he signed it; whereas, another witness for the prosecution, the daughter of the contractor, testified that her father did not submit it to her, but that the first time she saw this statement was when the investigators showed it to her. Thus, credibility became a matter for the jury as the prosecution presented its evidence.

The testimony as presented by the defendant may or may not have added further

contradictions and inconsistencies to the jury, so that the presiding judge was required to leave the determination on the basis of credibility to the jury. Thus the credibility of the prosecution's case was on the whole determinable only by the fact-finder.

The case, on the whole, charged three defendants who were employed in various positions in the Pennsylvania Department of Transportation for the Commonwealth with seeking contributions for either the local Democratic Workers' Committee situate in Greensburg, Westmoreland County, or for, on one or two occasions, the Democratic Workers' Committee in Harrisburg. There was no question in all of the evidence that no monies or contributions were sought for the benefit personally of the three individuals. One of the defendants had been a hold-over from previous administrations and testified that this was a continuation of practices, as formerly, by the previous administration. In any event, out of approximately 103 contractors, only six here used as prosecuting witnesses were named as victims of extortion under the Hobbs Act.

The Pennsylvania Department of Transportation is a division of the Commonwealth of Pennsylvania and has headquarters in various counties of the Commonwealth. In this particular instance, it has headquarters at Greensburg, Westmoreland County, and here were housed the administrators or heads of a division for this particular section. In some instances two or three counties were included for certain purposes in a particular area. The Department of Transportation, as it is commonly known as PennDot, is in control of the State highways of the Commonwealth and is the responsible department for constructing, re-constructing and maintaining these roads throughout the year. During the winter time, it is required to remove snow and to salt or cinder the highways in order to make them passable and useable. For these purposes it owns and operates Commonwealth equipment, but on occasion, and especially in emergencies, such as floods, or in the winter, additional specific equipment

is needed to supplement that owned by the Commonwealth, such as graders, salt and cinder spreaders and the like. For these it enters into annual contracts for contingent uses to which these may be put if and when needed. Of approximately 103 contractors for this particular zone, not all their equipment is used, while some are used more than others. So that whether or not any of the contractors who agreed to conditionally lease their equipment are able to profit by the contract, there are no assurances that any of the equipment will be used unless needed by the Commonwealth. In the ultimate, it is the District Superintendent who makes the decision if any particular piece of equipment is needed, when the garage engineer informs him that such is needed by any of the services within that district.

Since all counts of the indictment, including the first count charging conspiracy, as an important element in proving the violation there must be a showing that the defendants or some of them in some way or degree obstructed, delayed or affected commerce or the movement of any article or commodity in commerce, because in fulfillment of the second element he extorted or attempted or conspired to do, it then becomes necessary for me to examine the record to see whether or not the prosecution has fulfilled its obligation in connection with these two necessary elements.

So far as the first count of conspiracy is concerned, it is not necessary here to define what it is and what may comprise it, or to detail the many principles which apply under the circumstances of each case. It is sufficient here to note that the jury had been well and fully instructed since not a single objection was made to the charge of the court after the close of evidence, and after counsel had addressed the jury.

While counsel for the defendants had in their argument before the court on this motion been under some idea that it was incumbent upon the prosecution to prove that there had been an obvious agreement of some sort amongst the three defendants and argued that there was no showing of such, I quickly corrected counsel by relating

just what I had instructed the jury: that a scheme or plan, or combination amongst the three need not have been in writing or even verbal or even expressed in some other way, but that there must have been some understanding which had arisen over a period of time by which all three of them had come to an understanding that they were pursuing an idea or plan to violate the prohibiting statute by compelling, because of their official position and in reliance thereof, persons who might have been apprehensive that if payment of political funds were not made that they would suffer thereby in some way.

And while the defendants had inferred more than they had argued that all three defendants had not been involved in all of the overt acts and in the remaining nine counts of the indictment, they would not have been held accountable under Count 1 of the indictment, this, again, was explained in my instructions to the jury that all three defendants were not required to commit all of the overt acts, but if one of the three who had combined to violate the law had performed any one of the overt acts, all three would have been liable. Thus, while the law in this case might have harshly charged the supervisory employees of the Pennsylvania Department of Transportation with conspiracy, because of certain other circumstances, but particularly because they had not all been involved in all of the counts of the indictment, the argument of counsel is, nevertheless, invalid and the conspiracy charge based upon the evidence before me at the trial, must stand for jury determination.

■ As for the necessary element of interstate commerce, the theory upon which the law rests is very simple. The alleged victims must have been involved in interstate commerce in some way, if only in a minimal degree, and as such interstate commerce would have been affected. *United States v. Gill*, 490 F.2d 233, C.A. 7, 1973; *United States v. DeMet*, 486 F.2d 816, C.A. 7, 1973; *United States v. Augello*, 451 F.2d 1167, C.A. 2, 1971, cert. den. 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802; *United States v. Nadaline*, 471 F.2d 340, C.A. 5, 1973, cert. den. 411 U.S. 951, 93 S.Ct. 1924, 36 L.Ed.2d 414.

■ Actually, the effect upon commerce need be merely potential or subtle. *United States v. Augello, supra*. If trade in interstate commerce is affected in any way or degree by the extortion, it is a proper element. *United States v. Amato*, 495 F.2d 545, C.A. 5, 1974. Thus, the theory behind this necessary element is that interstate commerce is obstructed or affected in some way or degree and that money extorted from those engaged in interstate commerce has been depleted from interstate commerce.

Section 1951 of the statute does not specify the character or degree or manner in which the law would require a person to be held chargeable with obstructing, delaying or affecting commerce. However, the majority judicial determinations have held that any minimal interference with or effect upon commerce is sufficient. *United States v. Provenzano*, 334 F.2d 678, C.A. 3, 1964, cert. den. 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964); *United States v. Mazzei*, 521 F.2d 639, C.A. 3, 1975, cert. den. 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975).

■ Where the victim of extortion purchases goods in interstate commerce, then interstate commerce is affected as a matter of law. *United States v. Augello*, 451 F.2d 1167, C.A. 2, 1971; *United States v. Hulahan*, 214 F.2d 441, C.A. 8, 1954; *United States v. Lowe*, 234 F.2d 919, C.A. 3, 1956.

■ It does not matter whether the goods shipped in interstate commerce are shipped directly to the victim of the extortion or indirectly through a wholesaler or retail merchant. *United States v. Starks*, 515 F.2d 112, C.A. 3, 1975; *United States v. DeMet, supra; United States v. Amato, supra.*

In spite of the fact that Congress in a criminal Act, such as set forth in § 1951, used broad words such as "Whoever in any way or degree obstructs . . .", it has been held sufficient if it includes any mini-

mal nexus or connection with interstate commerce; and it accordingly is to be construed broadly and is not limited to conduct which directly and immediately obstructs the particular movement of goods in interstate commerce. *United States v. Pranno,* 385 F.2d 387, C.A. 7, 1967, cert. den. 390 U.S. 944, 88 S.Ct. 1028, 19 L.Ed.2d 1132.

In *United States v. Staszcuk,* 517 F.2d 53, C.A. 7, 1975, where Judge Stevens wrote the opinion, a defendant was charged with accepting $3,000 for not opposing a zoning change which would have permitted certain construction and had the construction proceeded as anticipated, materials for the construction would have crossed state lines. It was held here to have had sufficient nexus with interstate commerce.

It was said that the Hobbs Act must receive an expansive instruction, that where there is a threatened effect upon interstate commerce, notwithstanding absence of any actual effect, the Act applied. It held further that the commerce element of a Hobbs Act violation is satisfied even if the record demonstrates that extortion had no actual effect on commerce; and that jurisdiction in a particular case is satisfied by showing realistic "probability" that an extortionate transaction will have some effect on interstate commerce. Three judges dissented.

■ The power of Congress over interstate commerce is not confined to the regulation of commerce among the states, but also extends to those activities intrastate when it so affects interstate commerce, or the exercise of the power of Congress over it, as to make regulation of them an appropriate means for the attainment of the exercise of a constitutionally granted power. *United States v. Harris,* 460 F.2d 1041, C.A. 5, 1972, cert. den. 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130.

There are, however, some decisions which question the extent which Congress intended when it used the words "in any way or degree" in § 1951.

In the *Staszcuk* case, *supra,* as I said, three judges dissented on the interpretation which the majority judges of the Court of Appeals had applied and to the extent to which federal jurisdiction might also be applied. This is elaborated in the dissent, part of which is here quoted, by Judge Pell at page 62:

"I respectfully dissent from the result reached and while concurring in the dissenting opinion of Judge Sprecher, because of what I regard as a substantially incorrect extension of federal jurisdiction into a localized crime, I feel impelled to add the following comments.

The net effect of the majority decision is to construe the statute to read: 'Whoever in any way or degree potentially obstructs, delays, or affects commerce, even though he does not actually obstruct, delay, or affect commerce . . .'

The majority despite its scholarly consideration of what it deems Congress probably intended as the scope of its exercise of constitutional power to regulate commerce ignores that which Congress did in fact enact. In the recent case of *Burns v. Alcala,* 420 U.S. 575, 580, 95 S.Ct. 1180, 1184, 43 L.Ed.2d 469 (1975), the Supreme Court referred to the 'axiom that words used in a statute are to be given their ordinary meaning in the absence of persuasive reasons to the contrary.' The ordinary meanings of the jurisdictional words, 'obstruct, delay, and affect,' as detailed in dictionaries of the English language all appear to import the concept of accomplishment, a *fait accompli* rather than a *fait potentiel.* I do not find persuasive reasons for ignoring the ordinary, the plain and explicit, meanings of these key words by equating the breach of trust of a public official which has no actual effect upon commerce and which does not delay or obstruct commerce, as reprehensible as that misconduct may be with the widespread racketeering at which Congress intended to direct its enactment. I do not read the history quite as does the majority. It seems rather clear to me that Congress was not so much interested in removing artificial restraints on the free flow of goods as it was in striking down an evil which 'had

become very serious, and the local authorities either would not, or could not, check . . . .' *United States v. Local 807,* 118 F.2d 684, 687–688 (2d Cir. 1941). That the Hobbs Act which was aimed at a specific evil, is sufficiently broad to catch in its net other extortionists whose nefarious activities do in fact affect commerce does not signify to me an intention on the part of Congress, even if Congress has the constitutional power which is not at all clear, to extend the exercise of legislative power to local activities which have no effect whatsoever on interstate commerce. The determination of whether to prosecute federally what is essentially a local crime when it has some minimal connection with interstate commerce is a matter of prosecutorial policy with which the courts do not ordinarily concern themselves. We are, however, not dealing with a question of prosecutorial policy but rather prosecutorial power which I deem to be lacking."

In the case before me, the defendants question the rationale by which the prosecution has introduced the necessary elements of proof for a conviction; the fact that the alleged victims had at some time or other in the past purchased automobiles, trucks or machinery from out of state, that they used gasoline which came from out of state, and that they were working on highways which, in whole or in part, formed a part of an interstate network of roads. In accordance with the vast bulk of judicial determinations, anyone of these would have been sufficient for the trial judge whose duty it is—and not that of the jury—to determine from the evidence whether or not interstate commerce has been affected if the evidence is true, which last question is to be presented to the jury for determination. And yet there is much common sense in what the defendants here argue in line with what Chief Judge Swygert in *United States v. DeMet, supra,* at page 823 repeated from a previous holding in another case:

"Under this rationale, a retail store owner, for example would be afforded federal protection from extortion, regardless of the nature or the likely effect of the threat simply because his stock of merchandise had in some measure moved in interstate commerce."

There is considerable complaint by the Chief Justice and others that our federal courts are overworked. Perhaps the prosecution of local activities, where interstate commerce has the slightest nexus, is included in the class of cases which provides the heavier burden on our federal courts when they should be in the local state courts.

This line of argument carries much persuasion because all of us in our everyday living in this nation of ours, under modern methods, cannot escape the fact that throughout life every person cannot evade contact with interstate commerce under this rationale as set forth by Chief Judge Swygert. Orange juice and cereal at breakfast, with which most Americans start the day, are dependent in the vast majority of our states upon interstate commerce. So it is with coffee and tea. The integral part of the house which shelters us is produced in one way or another from materials grown in some few state forests of our country where lumber is produced. Practically all the clothes and jewelry which we wear ordinarily comes from out of state. The automobile in business or pleasure and the gasoline which propels it most likely does come from out of state. Certainly bananas, pineapples, coconuts and sugar do, when we consume any of the preserves or confections which they create. The medications which we need almost daily in our lives for headaches, colds, viruses, allergies and perhaps even as laxatives for nearly all Americans come interstate. Household utensils and appliances whether made from iron or copper, zinc or whatever metal in combination with other elements of necessity, come from a large number of states.

As for the contention of the defendants that the fact that the defendants supervise the work or workings on roads which form a part of the interstate highway system, there is merit in their arguments that this does not in itself constitute doing business interstate, since it is common knowledge

that, with the fewest possible exceptions, today the smallest byway interconnects eventually with interstate highways. Be this as it may judicial authority, as far as I am able to research it, considers such nexus, even though de minimus, sufficient.

In upholding the Unlawful Possession or Receipt of Firearm's Act, 18 U.S.C. Appendix, § 1201 et seq., a necessary element for conviction is that it must have been manufactured out of state and it makes no difference when it was manufactured so that interstate commerce applies. In other words, the "had come to rest" theory of certain items coming from out of state does not of necessity apply to all those things which we commonly use very day. In this connection see: *United States v. Irali,* 503 F.2d 1295, C.A. 7, 1974; *United States v. Pacente,* 503 F.2d 543, 549–550, C.A. 7, 1974; *United States v. DeMet, supra; United States v. Gill, supra.*

■ The defendants in this case also attack the interstate commerce evidence adduced in this case because they say there has been no showing by the prosecution that interstate commerce had in any way been affected by any of the payments which were made by the alleged victims. While this may have some rationality in its attack, it is under our present law not necessary to show a depletion or interference with the financial dealings of interstate commerce.

> "Where the resources of a business are depleted or diminished in any manner or degree by payments of money obtained by extortion the capacity to efficiently conduct such business is the extent of the drain on its resources likely to be impaired. * * * It is merely required by the law where extortion is shown that it did in some way or degree obstruct, delay or affect commerce. * * * It is the *depletion* of the resources of a business by extortion which permits as a reasonable inference if the extortion is established that its operations are delayed, obstructed, affected." *United States v. Addonizio,* 451 F.2d 49, at page 77, C.A. 3, 1972 (Emphasis added).

■ In my rather extensive research of this question, I have come upon only one case in which the Court of Appeals has not substantially agreed with this reasoning. In *United States v. Merolla,* 523 F.2d 51, C.A. 2, 1975, a construction contractor and his construction superintendent were verbally and physically molested even to the extent a knife was placed at the contractor's side and he was physically annoyed and threatened. The evidence indicated that he was beaten and compelled to sign a release contract acknowledging receipt of $25,000, and also was depleted "to the extent of $1300, a house trailer and his rights under the building contract." It was charged by the prosecution that his rights and buying power of the construction business engaged in interstate commerce and that these were interfered with and obstructed. There was no question that the evidence at the trial showed that electrical supplies and lighting apparatus were delivered to the job site from out of state; that steel joists were shipped interstate; that doors were delivered from out of state; and an automobile sold to the victim was assembled in another state and transported into New York.

A guilty verdict arrived at in the District Court was reversed and the Court of Appeals held that there was an insufficient showing to provide a basis for interstate commerce application. At page 54, it said:

> "The victim's purchase of interstate goods, however, must be of a continuing nature or the relationship between the extortion and any interstate commerce becomes merely conjectural. The cases relied upon by the government all involve ongoing establishments with recurring shipments from out-of-state."

And at page 55, the Appeals Court said:

> "Congress intended that federal courts should exert jurisdiction in these types of cases only where the defendant's actions cause or might cause an interference with interstate commerce."

> "We believe that the government failed to establish the interference with interstate commerce which is essential in a

Hobbs Act prosecution." (Emphasis added).

The defendants in the instant case argue that equipment which was used by the alleged extortion victims had been bought by them for general use and that there was no showing that any money which was paid by or extorted from any of the alleged victims had any impact whatsoever in their interstate commerce dealings. While this may be factually so, I am bound to find under our Circuit's decisions that interstate commerce has been affected in some way or degree, nevertheless, by these payments. *United States v. Addonizio, supra; United States v. Mazzei, supra.*

As to all counts, the witnesses to the alleged extortions testified they had legal fear as an additional reason for paying the demanded sums. While legal "fear" presented by some of the witnesses here was to the effect that they might not get business if they did not make the contribution, or that, as some stated, it was considered as a matter of good business, it was, nevertheless, sufficient. *United States v. DeMet, supra; United States v. Jacobs,* 451 F.2d 530, C.A. 5, cert. den. 405 U.S. 955, 92 S.Ct. 1170, 31 L.Ed.2d 231; *United States v. Addonizio, supra.*

However, another theory on which this statute may be relied upon as a basis for this prosecution is that these defendants were state supervisory employees and because of their status, a demand or demands by them held significance where it would not from one who was not so employed. *United States v. Braasch,* 505 F.2d 139 (C.A. 7 1974).

The defendants attack the charges contained in the 6th, 8th, 9th and 10th counts of the indictment and assert that the testimony as presented was as indicated in their briefs. After a thorough examination of the transcript itself, there is evidence which contradicts the assertions of the defendants, and thus presents a jury question. As to what weight the jury gives these contradictions and inconsistencies must be left to a jury and a trial judge would be reversed if he attempts to replace the jury in its fact-findings. Accordingly, the indictment must stand pending final decision by a jury. As for the other counts of the indictment, my holding must be in similar fashion.

A trial judge can grant a motion for judgment of acquittal only when the evidence as a whole is insufficient to support a conviction as a matter of law. *Verdugo v. United States,* 402 F.2d 599, C.A. 9, 1968. However, where there is evidence upon which a jury may reasonably base and find guilt beyond a reasonable doubt, the trial judge can not intrude on the function of the jury as the trier of fact. The evidence need not be of such overwhelming magnitude that the jury must inevitably find guilt beyond a reasonable doubt; there need only be sufficient, legal evidence which when viewed in the light most favorable to the government, a jury can reasonably and in good faith make a finding of guilt beyond a reasonable doubt. *United States v. DeGarces,* 518 F.2d 1156, C.A. 2, 1975; *United States v. Frol,* 518 F.2d 1134, C.A. 8, 1975.

The standard for evaluating a motion for judgment of acquittal is:

". . . whether upon the evidence, giving full play to the right of the jury to determine credibility weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. DeGarces, supra,* at page 1159, citing *United States v. Taylor,* 464 F.2d 240 at page 243 (2 Cir.).

Accordingly, the defendants' motion for Judgment of Acquittal will be denied.