**Ray MARSHALL, Secretary of Labor, Plaintiff,**

v.

**William R. KRAYNAK, Thomas Kraynak, George Robert Kraynak and Richard Kraynak, a partnership, trading and doing business as Kraynak Coal Company, No. 3 Mine, Defendants.**

**Civ. A. No. 77–962.**

United States District Court, W. D. Pennsylvania.

Sept. 27, 1978.

As Amended Oct. 23, 1978.

Alexander L. McNaugher, Asst. U. S. Atty., Frederick W. Moncrief, Office of Solicitor, Dept. of Labor, Pittsburgh, Pa., for plaintiff.

William P. Getty, Meyer, Unkovic & Scott, Pittsburgh, Pa., for defendants.

## OPINION

ROSENBERG, District Judge.

The matter now before me is on a motion for summary judgment filed by the plaintiff, Ray Marshall, Secretary of Labor, under the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 801 et seq. (hereinafter called the "Act"). The plaintiff seeks to enjoin the defendants, William R. Kraynak, Thomas Kraynak, George Robert Kraynak, and Richard Kraynak, a partnership, trading and doing business as Kraynak Coal Company, No. 3 Mine, from allowing Federal Inspectors, agents of the plaintiff, to inspect the Kraynak coal mine.

The defendants resist the action of the plaintiff on the basis that (1) the mine is totally owned and worked by them, four brothers, as owners, and accordingly no employees are "involved" as contemplated by the Act, and (2) the coal mined by them is totally sold and consumed within the State of Pennsylvania, intrastate, and does not involve interstate commerce.

Based upon the record, pretrial discovery matter, and the affidavit and admission of the defendants in their recital of the facts in their brief, the facts are not in dispute.

The mine in question, known as No. 3 Mine, is located in Wilgus, Indiana County, Pennsylvania and is owned and operated entirely by four brothers, the defendants herein. No other personnel have worked for the defendants from a period of at least seven years and this situation is expected to continue.

On April 27, 1977, pursuant to § 103 of the Act, 30 U.S.C. § 813 [1] authorized repre-

---

1. § 813. Inspections and investigations—Purposes.

"(a) Authorized representatives of the Secretary shall make frequent inspections and investigations in coal mines each year for the purpose of (1) obtaining, utilizing, and disseminating information relating to health and safety conditions, the causes of accidents and the causes of diseases and physical impairments originating in such mines, (2) gathering infor-

mation with respect to mandatory health or safety standards, (3) determining whether an imminent danger exists, and (4) determining whether or not there is compliance with the mandatory health or safety standards or with any notice, order, or decision issued under this subchapter. In carrying out the requirements of clauses (3) and (4) of this subsection, no advance notice of an inspection shall be provided to any person. In carrying out the require-

sentatives of the plaintiff went to the mine to conduct an inspection. By the use of four dogs the defendants prevented the inspectors from leaving their vehicle, and they left. The inspectors returned later that day and succeeded in meeting with Thomas Kraynak, one of the defendants. Again the inspectors were refused admittance. The defendants admit that in 1977 they produced 12,524 tons of coal, 9,000 tons of which came from Mine No. 3, the mine in question, and that during that same period, the defendants delivered to Penntech Papers, Inc., a total of 10,268 tons amounting to over 80% of the defendants' total production. Penntech is a paper processing corporation actively engaged in interstate commerce and depends upon commerce with facilities in other states for its supplies of raw materials. Upon completion of the paper producing process, the various products are sold throughout the country with only approximately 5% remaining within the state.

■ The first question raised by the defendants is that under the holding of *Morton v. Bloom*, 373 F.Supp. 797 (D.C.Pa.1973), an owner-operated mine, which produces only a minimal amount of coal, sells its product wholly within the state, and does not employ any miners, is not subject to the provisions of the Act. In the *Bloom* case, *supra*, a single man owned and operated his mine and sold the coal entirely intrastate. The court decided the issue solely on the producer's effect on interstate commerce, which it held to be minimal. No specific reference was made as to whether owner-operated mines are excluded from the Act. The question of interstate commerce, however, was considered and held not to apply.

The legislative history of the Act clearly indicates that Congress did not intend to create a special class of mines exempt from its coverage. The framers were concerned specifically with the Nation's attitude permeating the coal industry that mining was a hazardous occupation. Despite the hazardous nature, the Human Resources Committee was determined that these hazards be substantially reduced or eliminated. 3 U.S.Code Cong. & Admin.News 1977, p. 3403. To this effect, the Committee announced that it was essential that there be a common regulatory program for all operators and equal protection under the law for all miners. Id. at p. 3413.

By requesting support for differentiation between owner-operated mines from non-owner mines where employees labor, the defendants seek to place a value on an owner-operator's life as far below that of a miner in any employer-employee setting. The fact that one is part owner of an enterprise does not, in and of itself, give a court leave to allow such an owner the right to expose himself to unnecessary harm where Congress has otherwise directed. When a court sees fit to include within the Act an independent contractor involved in the sinking of shafts and excavating tunnels in a coal mine, as was done in *Bituminous Coal Operators' Ass'n v. Secretary of Interior*, 547 F.2d 240, C.A. 4, 1977, it is unlikely that an owner who also mines his own coal would be placed in a separate class.

The intent of Congress is unambiguous that operators working as miners are included in the Act.

> Section 802(d) states, " 'operator' means any owner, lessee, or other persons who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine;"

> Section 802(g) states, " 'miner' means any individual working in a coal or other mine;"

---

ments of clauses (3) and (4) of this subsection in each underground coal mine, such representatives shall make inspections of the entire mine at least four times a year."

Further additional subsections provide the right of the Secretary to have "a right of entry to, upon, or through any coal mine" for purposes of inspection, developing improved man-

datory health standards, procuring records and the like. In addition, provision is made for public hearings, consultation with appropriate state representative "when feasible, of any plan to recover any person in the mine or to recover the mine or to return affected areas of the mine to normal" together with provisions for notice.

Section 803 provides "Each coal or other mine, the products of which enter commerce, or the operations or products of which affect commerce, and each *operator* of such mine, and every *miner* in such mine shall be subject to the provisions of this chapter." (Emphasis supplied)

Accordingly, I find no difficulty, whatsoever, in holding that coal mine operators, particularly those who are at the same time miners, are included in the Act.

The second question raised by the defendants is that since they sold coal only intrastate to Penntech Paper Co. and that it was within the State, the Act does not include them. The undisputed fact here is that the defendants sold 9,000 tons of the coal mined at No. 3 Mine to Penntech and that Penntech used it with supplies procured interstate and sold 95% of the products so produced interstate.

In the case of *Secretary of Interior v. Shingara*, 418 F.Supp. 693 (D.C.Pa.1976), the defendant's owner-operated mine sold its coal intrastate primarily to one C. V. Lenig. He in turn sold the coal, along with coal from other small producers, to Keystone Filler Mfg. Co. in intrastate transactions. Keystone then combined the coal with others, processed it into a powder and sold it to interstate customers. Although the defendant's contribution appeared far removed and rather miniscule, the court there held that the coal "clearly 'enters commerce'", or alternatively, " 'affects commerce'", (at page 694).

The case of *Andrus v. Kaskan, et al.*, C.A. 77–259 (W.D.Pa.1977) is also relevant to the instant matter. There the defendants sold 2,000 tons of coal annually to a broker who in turn sold it to a power company, all intrastate transactions. The power company, however, used the coal to produce electricity for both the forum state and its neighboring state. The court held that although defendant's mine contributed very little of the coal consumed, the combined production of all the nation's small, privately owned mines was certainly not negligible in affecting interstate commerce.

The circumstances of this case and the applicable law are no different than those in which the question of interstate commerce is raised, whether in civil or criminal proceedings, and where it is shown that the labor involved, the sources of supplies and equipment and the movement of the finished product are interconnected with interstate commerce. For a detailed list of cases in which interstate commerce defines such circumstances see *United States v. Cerilli et al.*, 418 F.Supp. 557 (W.D.Pa.1976).

In *Mandeville Island Farms, Inc. et al. v. American Crystal Sugar Co.*, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1947), the Supreme Court considered a case closely aligned to the principle involved in the instant case in an antitrust action relating to sugar beets and the sugar derived from these. When it was sought to show that sugar beets from which eventually sugar was procured were separate and distinct commodities, the Court said,

"For mere change in the form of the commodity or even complete change in essential quality by intermediate refining, processing or manufacturing does not defeat application of the statute to practices occurring either during those processes or before they begin, when they have the effects forbidden by the Act." And cases therein cited in the footnote. (at page 238, 68 S.Ct. at 1007).

But in *Costanzo Coal Mining Co. v. Weirton Steel Co.*, 150 F.2d 929, C.A. 4, 1945, cert. den. 326 U.S. 765, 66 S.Ct. 147, 90 L.Ed. 460 (1945), we have practically the exact circumstance and principle involved in this case. In *Costanzo*, coal was mined, sold and used in furnaces of the Weirton Steel Co. in processing steel. The steel produced by the Weirton Steel Co. was sold interstate. It was held that the sale and delivery within the state of coal used by a buyer in producing steel which was sold and shipped to customers outside the state was within the purview of a statute relating thereto as directly "affecting interstate commerce". At page 934, this was said:

". . . It is true that the sales and deliveries of coal under consideration in

this case were completely intrastate, but it is stipulated that the coal was used by Weirton Steel Company, the defendant, in the boilers and furnaces of its steel manufacturing plant at Weirton, West Virginia, the products of which have been largly (sic) sold and shipped to customers outside the State. The Commission, acting under the authority of §§ 4–A and 15 of the Act determined after hearing that such sales in West Virginia are subject to the minimum price requirements of the Act, and it is not disputed that such transactions directly affect interstate commerce in coal within the meaning of that phrase in the statute."

Accordingly, I hold that the selling by the defendants of over 10,000 tons of coal annually to a paper producer whose products are nationally distributed enters and affects interstate commerce within the meaning of § 803 of the Act. Consequently, the plaintiff's motion for summary judgment will be granted.